**SCHLAFLY v. UNITED STATES.**

(Circuit Court of Appeals, Eighth Circuit. February 17, 1925. Rehearing Denied March 28, 1925.)

No. 6661.

**1. Bankruptcy ⊜⇒467—Findings of referee, approved by court, will not be disturbed on appeal unless clearly erroneous.**

In a proceeding in equity or bankruptcy findings made on disputed evidence, while not conclusive on an appellate court, unless clearly against the weight of evidence or based on a mistaken view of the law, will not be disturbed, especially where made by a master, or in a bankruptcy proceeding by the referee, and approved by the court on review.

**2. Internal revenue ⊜⇒7—Contract for limited retention of possession of manufacturing plant by vendor and payment of rent held bona fide and valid.**

A finding that an agreement by which the vendor of a manufacturing plant retained possession for a year, paying rent to the purchaser, was bona fide and not a subterfuge to nominally increase the actual selling price, held sustained by the evidence.

**3. Fraud ⊜⇒50—Burden of proof on party pleading fraud.**

The burden of proof to establish fraud rests on the party pleading it.

**4. Internal revenue ⊜⇒7—To constitute affiliation of corporations, required to make joint return, through stock ownership, only voting stock is to be considered.**

Under Revenue Act 1918, §§ 240a, 240b (Comp. St. Ann. Supp. 1919, § 6336⅛ss), required affiliating corporations to make a joint return, and providing that two corporations should be deemed affiliated when one owned or controlled substantially all the stock of the other, only voting stock which carries control of the corporation is contemplated.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

In the matter of the Temtor Corn & Fruit Products Company, bankrupt. John F. Schlafly, trustee, appeals from an order of the District Court allowing the claim of the United States for income and excess profits taxes. Affirmed.

For opinion below, see 299 F. 326.

This is an appeal from an order of the District Court, approving an order of the referee in bankruptcy, allowing a claim of the United States against the estate of the bankrupt, Temtor Corn & Fruit Products Company, hereafter referred to as the Temtor Company, for $36,395.23 as the balance due for income and excess profit taxes from the Temtor Company for the year 1920. The referee allowed the claim, filing an elaborate opinion, reviewing the evidence, stating his findings and the conclusions of law. On a petition for review, the allowance of the claim was by the District Court approved. 299 Fed. 326.

Exhibits 1 and 2 to Mr. Hall's testimony (who was the attorney for the vendor in the transaction) are the agreements for the sale, purchase, and lease of the plant, between the Corn Products Refining Company, here-

after referred to as the Products Company, and the Best-Clymer Company, hereafter referred to as the Clymer Company.

The agreement between the parties provided for the sale and purchase of the Granite City plant, the property of the Products Company, to the Clymer Company for the price and sum of $4,500,000, to be paid $50,-000 in cash and the balance in cash upon the delivery of deed on January 2, 1920, provided that the buyer is to let and rent it to the seller until October 1, 1920, at an aggregate rental of $1,245,000 payable in monthly installments. The seller also agreed to pay as additional rent for said premises all taxes and water rents that may be levied and become a lien on said property on or before October 1, 1920, to keep the property insured in an amount not less than $2,750,-000; the loss to be payable to the buyer; that there should be no abatement of rent in case of fire or accidental destruction of the plant or any part thereof; that upon the expiration of the term, when possession is delivered to the buyer, the premises shall be in as good condition and state of preservation as at the present time, usual wear and tear excepted. The buyer also obligates itself to purchase from the seller all merchandise manufactured and in process, supplies and stores, on hand October 1, 1920, at the fair market value to be paid in cash. The sale is not to include trade-marks, trade rights, or good will of the seller.

The agreement was subject to approval by the United States District Court for the Southern District of New York, the court in which the decree in the proceeding by the United States against the Products Company under the anti-trust statutes of the United States had been rendered. That decree provided that the Products Company is required to sell the Granite City plant, subject to the approval of the court, with a proviso that only persons or corporations intending to continue the business shall be eligible as purchasers. Exhibit 12 is a contract between the promoters of the organization of the Temtor Company and the bankers, in order to secure the funds necessary to enable it to purchase from the Products Company its manufacturing plant, located at Granite City, state of Illinois. That contract provided for the incorporation of a new company, to acquire the Granite City plant from the Products Company, and also the common stock of the Clymer Company. There were to be two classes of stock, A and B. Class A shares to be entitled to a priority of dividends up to $4 a share per year

(equivalent to 8 per cent. a year, the shares were to be no par, and to be sold to the public at $50 a share), and the dividends to be cumulative. In case of liquidation, Class A shares to have priority up to $50 a share. The stockholders of the Clymer Company were to receive 27,750 shares of Class B stock in exchange for their common stock of the Clymer Company, subject to certain conditions. 137,500 shares Class A stock and 20,000 shares of Class B stock of the new corporation to be issued to the bankers, who were to pay into the treasury of the new corporation $5,500,000, provided the Granite City plant of the Products Company is acquired for $4,500,000. It further provided that from the rental to be paid by the Products Company to the new corporation the first $765,000 shall be deposited in a trust company to be held for the payment of the dividends of $4 per share on both classes of stock of the new company during the first year, i. e., from October 1, 1919, to October 1, 1920.

On October 3, 1919, the Temtor Company was incorporated under the laws of the state of Illinois.

At a meeting of the board of directors of the Clymer Company on September 19, 1919, the agreement with the Products Company for the purchase and lease of the Granite City plant, and with the bankers for securing the funds necessary to make the purchase, were ratified and approved, and later by the stockholders.

After the incorporation of the Temtor Company, on October 3, 1919, under the laws of the state of Illinois, at a meeting of its board of directors, an offer for the sale of the shares, in conformity with the agreement with the bankers, was accepted and later consummated. This offer was made by Mr. Frank P. Page, acting evidently for the bankers. The offer was that he would subscribe for 137,640 shares of Class A stock, and 55,500 shares of Class B stock, upon the following conditions:

He would sell and transfer to the Temtor Company 18,500 shares of the common stock of the Clymer Company, and pay $5,449,000 in cash, $4,500,000 of that sum to pay for the Granite City plant, agreed to be purchased from the Products Company; that the Temtor Company will immediately, upon acquiring the plant, lease it to the Products Company, on the terms set forth in the agreements between that company and the Clymer Company, and accept an assignment of those agreements from the Clymer Company. He also stated that a syndicate had

been formed to purchase 113,000 shares of Class A stock to be issued by the Temtor Company at $44 a share; that he will distribute 27,500 shares of the Class B stock among the stockholders of the Clymer Company, the distribution to be made in the ratio of 1 share of the Clymer stock for 1½ shares of the Temtor stock, as had been agreed on by its stockholders; the remainder of Class B stock to be divided among his associates and the management of the Temtor Company.

At a meeting of the board of directors of the Temtor Company on November 11, 1919, a resolution was adopted to set aside as a trust fund, out of the rents received from the Products Company for the Granite City plant, sufficient money to assure the payment of $4 per share per annum on all the issued and outstanding shares of this company, and a dividend was declared of $4 a share payable out of the fund set aside, payable quarterly, beginning on January 5, 1920. $765,000 was accordingly set aside from the rentals received and applied to the payment of dividends.

The articles of incorporation of the Clymer Company provided that the preferred stock shall have no voting rights whatsoever, nor shall the holders thereof be entitled to receive notice of stockholders' meetings, except if the cumulative dividends on the preferred stock shall remain unpaid for two consecutive years, the preferred stock shall then be entitled to vote on all questions until the defaulted cumulative dividends on the preferred stock shall have been paid.

The authorized capital stock of the Clymer Company was 10,000 shares of preferred stock of the par value of $100 each, and 20,000 shares of common stock without nominal or par value.

The claim of the United States in controversy is for an assessment for income and excess profit taxes amounting to $114,668.30 of the Temtor and Clymer Companies, and interest on the deferred installments amounting to $143.34, or a total of $114,811.64. Three of the installments had been paid, leaving a balance of $22,571.18 due and interest thereon amounting to $1,410.70. An additional income and excess profit tax was assessed by the Commissioner of Internal Revenue in December, 1922, amounting to $12,713.35, and the entire claim due December 31, 1922, is for $36,695.23.

In the assessment $1,000,000 received by the Temtor Company from the Products Company as rent for the plant in that year was included, and if properly included the claim was properly allowed, provided it was lawfully made, which is attacked by appellant upon grounds hereafter stated. If this rent is to be excluded, as contended by counsel for appellant, the claim was improperly allowed.

In the motion of appellant to disallow the claim, so far as it is necessary to state them, the grounds are:

That there were no income or excess profits during that year.

That the $1,000,000 included in the return of the Clymer Company, as alleged rental collected from the Products Company, was a mere sham; that the real purchase price for the Granite City plant was $3,500,000, and that the $4,500,000 inserted as the purchase price in the deed of conveyance was to make a market in behalf of the promoters for the sale at a profit of the stock of the Temtor Company, to be formed and which the promoters had underwritten, and that in fact no part of the $1,000,000 was a rental for the plant sold.

Another ground relied on in behalf of appellant is that the return on which the assessment was made was a joint return for the Temtor and Clymer Companies, and unauthorized. The Temtor Company owned all the common stock of the Clymer Company, which alone had voting power. Its preferred stock was held by a number of persons who owned it for investments, but this stock had no voting power, so long as there was no default in the payment of the prescribed dividends and there was no default during the period in controversy.

Frank H. Sullivan, of St. Louis, Mo. (James C. Jones, Lon O. Hocker, and Eugene H. Angert, all of St. Louis, Mo., on the brief, and Julius M. Mayer, of New York City, amicus curiæ), for appellant.

Allen Curry, U. S. Atty., of St. Louis, Mo. (Theodore Rassieur, of St. Louis, Mo., amicus curiæ), for the United States.

Before KENYON, Circuit Judge, and TRIEBER and PHILLIPS, District Judges.

TRIEBER, District Judge (after stating the facts as above). In the argument of counsel for the appellant, the principal ground relied on for a reversal is that the finding by the referee, approved by the learned District Judge, is not warranted by the evidence; that the evidence requires a finding that the lease of the Granite City plant was simulated and the rental paid thereunder a return of the purchase price.

[1] At the outset we are confronted with the well-settled rule that, in a proceeding in equity—and this must be treated as such—the findings of the chancellor on disputed evidence have not the conclusive effect as the findings of a jury, or of the trial judge when a jury has been waived, in an action at law; but, unless it is clearly against the weight of the evidence or based on a mistaken view of the law, it will not be disturbed by an appellate court, especially if the finding has been made by a master, or in a bankruptcy proceeding by the referee, and approved by the court on a petition for review. Ohio Valley Bank Co. v. Mack, 163 F. 155, 158, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184; Baker v. Bishop-Babcock-Becker Co., 220 F. 657, 136 C. C. A. 265.

In Ohio Valley Bank Co. v. Mack, Circuit Judge Lurton, later a Justice of the Supreme Court, speaking for the court, said: "If the finding is based upon conflicting evidence involving questions of credibility and the referee has heard the witnesses, much greater weight naturally attaches to his conclusion, and the weight of authority is that the District Judge, while scrutinizing with care his conclusions upon a review, should not disturb his finding unless there is most cogent evidence of a mistake and miscarriage of justice. * * * The conclusion he reached in favor of the validity of his debt has also passed the scrutiny of the District Judge. Under such circumstances this court is not warranted in overturning the conclusions of two courts upon anything less than a demonstration of plain mistake."

But it is claimed that this rule does not apply to the instant case, as the hearing before the referee was on depositions entirely, and he had no better opportunity to determine the credibility of the witnesses than this court has.

Prior to the promulgation of the present equity rules, the evidence in equity cases was entirely on depositions, yet the same rule of law was followed by the Supreme Court and all other national appellate courts.

In Newell v. Norton, 70 U. S. (3 Wall.) 257, 267 (18 L. Ed. 271), which was an admiralty case, in which the entire evidence was on depositions, it was held: "It is enough to say that we find ample testimony to support the decision, if believed; and that we again repeat, what we have often before decided, that in such cases parties should not appeal to this court with any expectation that we will reverse the decision of the courts below, because counsel can find in the mass of conflicting testimony enough to support

the allegations of the appellant. * * * Parties ought not to expect this court to revise their decrees merely on a doubt raised in our minds as to the correctness of their judgment, on the credibility of witnesses, or the weight of conflicting testimony." And this court has uniformly so held. Dickey v. Dickey, 94 F. 231, 36 C. C. A. 211; Harrison v. Fite, 148 F. 781, 78 C. C. A. 447; Mastin v. Noble, 157 F. 506, 85 C. C. A. 98; United States v. Marshall, 210 F. 595, 127 C. C. A. 231; United States v. Grass Creek Oil & Gas Co., 236 F. 481, 149 C. C. A. 533; De Laval Separator Co. v. Iowa Dairy Separator Co., 194 F. 423, 114 C. C. A. 385, and authorities there cited. The error must be palpable to justify it. Babcock v. De Mott, 160 F. 882, 88 C. C. A. 64.

This applies with greater force, if two courts have reached the same conclusion. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181; Page v. Rogers, 211 U. S. 575, 29 S. Ct. 159, 53 L. Ed. 332; Princeton First National Bank v. Littlefield, 226 U. S. 110, 33 S. Ct. 78, 57 L. Ed. 145; United States v. State Inv. Co., 264 U. S. 206, 211, 44 S. Ct. 289, 68 L. Ed. 639. A careful review of the evidence fails to show that the transaction between the Products and the Clymer and Temtor Companies was not what it purports to be, a sale of the Granite City plant for $4,500,000, and the lease of the plant to the Products Company until October 1, 1920, at an aggregate rental of $1,245,000, payable in monthly installments.

[2] The undisputed testimony establishes that under the decree of the District Court for the Southern District of New York in an anti-trust suit instituted by the United States against the Products Company, it was required to sell this plant. In all the negotiations between the parties the Products Company refused to take less than $4,500,000 for the plant, and a lease of the plant to the Products Company until October 1st of the succeeding year, or for one year. All offers of a less sum were refused by it, and several were made. It insisted on the lease in order to enable it to manufacture the products made in that plant, to fill contracts of sale for the product, then in force, and made that a condition of the sale. Before the sale could be completed, it was necessary to obtain the approval thereof by the District Court for the Southern District of New York, as was provided in the decree of that court in the anti-trust suit. The petition to that court, presented for its approval, stated the provisions of the agreement for the

sale, and that the purchaser would continue the business, and was accompanied by an affidavit of Mr. Bedford, its president, that the price to be received for the plant was a fair one, taking into consideration the lease of the plant, although to reproduce it at that time it would cost more; that neither the Clymer, nor the new corporation to be formed, was in any way controlled by or affiliated with the Products Company or any of its affiliated corporations; that no stockholder of the Products Company has any substantial interest in the stock or securities of either of said corporations, nor any of its officers or directors any interest in common with them. The petition was by the court approved, and on January 2, 1920, the deed and lease for the plant were executed and delivered, reciting the consideration to be $4,500,000, and revenue stamps required for that sum affixed thereto.

Mr. Bedford testified that he considered that the plant should earn $2,500,000 annually, and therefore refused the offer of the purchasers to divide the profits of the plant with them. He considered the annual rental of $1,240,000 to be reasonable, including the other terms of the lease, namely, that the Products Company was to pay as additional rent all taxes and water rents, to keep the property insured in an amount not less than $2,750,000 for the benefit of the lessors, and that there should be no abatement of rent in case of fire or accidental destruction of the plant.

He further testified that, shortly before the expiration of the lease, he offered to renew the lease for six months on the same terms, which was refused; Mr. Clymer, representing the Temtor Company, telling him he would not renew the lease for $1,000,000 a month. This is undisputed.

Mr. Fisher, the secretary and treasurer of the Products Company, testified that the amounts paid for rent of the plant were entered on the books of the corporation as expenses, and $4,500,000 as the sum received for the plant, and the profit and loss account charged with a profit of $2,079,049.31, the excess of its value, as it appeared on its books and the $4,500,000 received for the plant from the Temtor Company.

The contention, and we may say the sole contention, on behalf of appellant, and based solely on inferences, is that the entire transaction was merely a subterfuge, to enable the bankers, who had underwritten the sale of the Class A stock of the Temtor Company, to declare 8 per cent. dividends, and thereby impress on the public the great value of this stock; that in order to enable them to do so, the lease was resorted to and thereby added to the real consideration to be paid for the plant the sum called rental. We may assume this to be true, so far as the promoters, the new company, and the brokers were concerned, still the appellant's contention is without merit, as there is no evidence whatever that the Products Company was a party to it.

Even if the agreement had provided for the sum, less the rentals, but that as a further consideration for the purchase of the plant, the vendor should retain possession thereof for a year, without payment of a rental, except the assumption of the provisions relating to the payment of taxes and insurance by the vendor, the real rental value of the plant would be a part of the consideration of the sale, and a very valuable part thereof.

There is nothing unusual in a sale of real estate, for the vendor to provide, with the consent of the vendee, for retention of possession of the premises for a certain time and paying rent therefor on terms agreed on by the parties. The vendor may desire to retain possession of the premises, until he can find another location, either for his business, or, if the premises are occupied as a home, of another home. The premises may be under an unexpired lease, entered into years ago, when rents were much lower than at the time of the sale, and therefore he is unable to deliver possession, and the vendee demands the present rental value. May not the vendor and vendee agree on the rental to be paid by the vendor for that unexpired term on a basis of present rental value?

That the vendee would be entitled to a rental for the year its vendor had the use of the plant is beyond question; and if the vendor was willing to pay the sum specified in the agreement, and assume the other obligations of the agreement, the vendee or his representative, the trustee in bankruptcy, has no right to complain.

What evidence is there to justify a finding that the Products Company made this agreement for the purpose of enabling the promoters to perpetrate a fraud on any one? There can be but one answer: None.

The resolution of the Temtor Company, setting aside a part of the rental for the purpose of paying dividends on its shares of stock, had no connection with the transaction between the Products and Clymer Companies. There is not a shadow of evidence that it had knowledge of how the promoters or bankers would raise the purchase money

for the plant. The final agreement for the sale and lease between the parties had been made on September 16, 1919, to become effective upon its approval by the District Court of New York. This was obtained by the order of that court on October 25, 1919. The resolution for the setting aside of a sufficient part of the rentals for the purpose of paying the dividends on its shares was adopted by the board of directors of the Temtor Company at its meeting on November 11, 1919, when the only obligations assumed by the Products Company were to execute its deed of conveyance of the plant on January 2, 1920, and carry out its obligations of the terms of the lease.

All parties to the contract considered the lease as favorable. The representatives of the Clymer Company, and of the new company to be formed, preferred an equal division of the profits of the plant as rental, which the Products Company declined, as being less favorable to it. The Products Company was willing to renew the lease on the same terms, for a period of six months after October 1, 1920; but the Temtor Company declined to grant it, considering it worth more. That thereafter the Temtor Company sustained losses in the operation of the plant, could not affect the validity of the transaction. It is a well-known fact that many businesses, although making large profits during the years 1919 and 1920, were less successful in the succeeding years, in fact sustained losses, owing to the changed conditions prevailing in the country.

[3] The losses may have been due to lack of proper management. But whatever may have been the cause, it cannot affect the good faith of the Products Company. The burden of proof was on the appellant, who pleaded the fraud. Jones v. Simpson, 116 U. S. 609, 615, 6 S. Ct. 538, 29 L. Ed. 742; Walker v. Collins, 59 F. 70, 8 C. C. A. 1; Crawford v. Broussard, 260 F. 122, 171 C. C. A. 158; In re Hawks (D. C.) 204 F. 309, 316, affirmed 213 F. 177, 129 C. C. A. 521. None was offered, and counsel for appellant rely entirely on presumptions arising from the terms of the lease.

As the money was collected as rentals, the company was liable to pay the income and excess profit taxes under the then existing laws of the United States.

[4] This conclusion leaves only for consideration whether the Internal Revenue Commissioner had the right, under the law, to require a consolidated report of the Clymer and Temtor Companies, in view of the fact that the Temtor Company owned all of the voting stock of the Clymer Company, although considerable of its Class A stock, which had no voting right at that time, was owned by others?

The pertinent provision of the Income Tax Law of 1918, is section 240(a), 40 St. 1081 (Comp. St. Ann. Supp. 1919, § 6336⅛ss), and reads:

"(a) That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the commissioner with the approval of the secretary, make a consolidated return of net income and invested capital for the purposes of this title and title III, and the taxes thereunder shall be computed and determined upon the basis of such return. * * *

"In any case in which a tax is assessed upon the basis of a consolidated return, the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or, in the absence of any such agreement, then on the basis of the net income properly assignable to each. * * *

"(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

We fully agree with the views expressed by the court below:

"Here in this case all of the voting stock was held by the bankrupt, though there were some 3,000 other stockholders holding preferred stock, which had no vote until dividends were passed for a stated period. I readily appreciate that the control of one corporation over another is ordinarily had by reason of control of the voting stock therein, and not through control of the nonvoting stock. It is also true that no one is to be taxed unless there exists a statute which authorizes the imposition of the tax. Such a statute is, however, to be given a reasonable construction, when it in fact exists, with a view to carrying out its purpose and intent. Here the purpose of Congress was to forestall such manipulation of profits of one corporation, through control by reason of voting stock, as would prevent the government from ascertaining correctly, and from collecting the sums justly due it, from excess profit taxes, of the controlled and affiliated corporations.

"I reach, then, but by another method, the conclusion reached by the referee—that is, that Congress had in mind voting stock only, or such stock as carried control by one corporation over its affiliated corporation. Unless this was the purpose or meaning of Congress, the statute is practically worthless and wholly incapable of enforcement."

The judgment of the court below was right and is affirmed.