## UNITED STATES v. CLEVELAND, P. & E. R. CO., Inc.

### No. 5451.

Circuit Court of Appeals, Sixth Circuit.

July 1, 1930.

John H. Pigg, of Washington, D. C. (Wilfred J. Mahon, of Cleveland, Ohio, and C. M. Charest, of Washington, D. C., on the brief), for the United States.

J. C. Little, of Cleveland, Ohio (Tolles, Hogsett & Ginn and J. W. Reavis, all of Cleveland, Ohio, on the brief), for appellee.

Before DENISON, MACK, and HICKS, Circuit Judges.

MACK, Circuit Judge.

Appeal from a judgment for defendant entered on the pleadings in an action by the United States under section 283(j) of the Revenue Act of 1926 (44 Stat. 9, 65, 26 USCA § 1064(j) to recover income and profits taxes for the years 1918 and 1919. The 1926 act provided that when, prior to its effective date, a hearing was had before the Board of Tax Appeals, there could be no review by the Circuit Court of Appeals but that the Commissioner might within one year bring suit for the collection of any amount disallowed by the Board. In such a suit, the findings of the Board are prima facie evidence of the facts. In the case at bar the findings of the Board were incorporated in the answer. Defendant moved for judgment on the pleadings. Since, for the purposes of such motion, all facts properly pleaded and not denied are to be taken as true, the statutory presumption may be disregarded, and the findings of the Board, which are not controverted by the government, considered·

merely as part of the facts stated in the complaint and answer. These may be briefly summarized as follows:

Defendant, the Cleveland, Painesville & Eastern Railroad Company, an Ohio corporation, was organized in 1895 to construct an interurban railway between Cleveland and Painesville, Ohio; in the following year it acquired and began to operate such a railway. In 1901 its charter was amended so as to authorize it to extend its line to Ashtabula, Ohio; it acquired rights of way and other property for this purpose. For some reason it was decided to have this extension constructed by a separate corporation. In April, 1901, the Cleveland, Painesville & Ashtabula Company, hereinafter called the Ashtabula Company, was organized; in 1902 it acquired the rights of way from defendant and constructed the road between Painesville and Ashtabula. Upon its completion, the trains of the two companies were operated between Cleveland and Ashtabula, over the tracks of defendant from Cleveland to Painesville, and over the tracks of the Ashtabula Company from Painesville to Ashtabula, under a series of traffic agreements between the two companies. From 1906 on, the properties of the two companies were operated as a single railroad. The business of both companies was controlled and managed by the same officers from defendant's office at Willoughby, Ohio. Defendant owned and operated the repair shops at which all repairs were made on the equipment of both companies, and supplied all electric power. All labor, supplies, and materials used in the operation of both roads were hired or purchased and all bookkeeping and financing done by defendant. The Ashtabula Company did not pay for these services and supplies, but defendant rendered monthly invoices for the expense of operating the Ashtabula line based upon an arbitrary apportionment of the total expense of operating both companies. These invoices were never paid, but annual demand notes were given to defendant for the amount of aggregate invoices; these notes likewise were never paid, so that during the tax years concerned the Ashtabula Company owed defendant more than $240,000 on this account, as well as about $120,000 for other advances.

The directors and officers of the two companies were identical, except that defendant had two more directors than the Ashtabula Company. During the years in question defendant owned 7090 of the outstanding 10,000 shares of stock of that company and $150,000 principal amount of first mortgage Ashtabula Company bonds; its chief stockholder, moreover, owned $282,000 of such bonds, out of a total issue of $1,000,000. Interest on the bonds was in default. Beginning in 1907, the Ashtabula Company sent to its stockholders notice of the annual meetings together with proxies running to the president and treasurer of defendant. At stockholder meetings of the Ashtabula Company during the calendar years concerned, 7,688 shares were voted in 1918, and 8,315 in 1919. Of these, defendant in 1918 voted the 7,090 which it owned and 541 shares through proxies, and in 1919, its own 7,090 shares and 1,187 proxies, so that during these years it actually voted more than 99 per cent. of the stock voted at these meetings. The outstanding 2,910 shares of the Ashtabula Company, not owned by defendant, were held in small blocks by approximately one hundred persons.

Upon these facts, the Board of Tax Appeals held, reversing the ruling of the Commissioner, that the Ashtabula Company and defendant were affiliated during the taxable years 1918 and 1919. Appeal of Cleveland, Painesville & Eastern Railroad Co., 4 B. T. A. 637. The District Court adopted the conclusion of the Board and entered judgment accordingly. 34 F.(2d) 316. The government contends that the question whether or not defendant and the Ashtabula Company were affiliated is a question of law, and that, under a proper interpretation of section 240 (b) of the Revenue Act of 1918 (40 Stat. 1082), and articles 631 and 633 of Regulations 45, there was no affiliation. Respondent contends that the patent purpose of the statute was to tax business units as such, and therefore the government's contention that ownership of stock is alone determinative and actual economic control must be disregarded, is unsound.

Section 240(b) of the Revenue Act of 1918 (40 Stat. 1057, 1082) provides:

"(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests."

(1) Few provisions in any of the income tax statutes enacted since the ratification of the Sixteenth Amendment have required a greater amount of litigation and judicial labor for their clarification than those relating

to "invested capital"[1] in the Act of 1917 and subsequent acts, and those attempting to define corporate "affiliation" in the act of 1918 and later statutes. We shall at the outset endeavor to ascertain the purpose and meaning of section 240(b) by resort to the legislative history of that section and then by examination of the conflicting interpretations given it both by the Board of Tax Appeals and the courts.

The first requirement that "affiliated" corporations file a consolidated return of net income and invested capital appeared in an administrative regulation[2] promulgated by the Commissioner pursuant to the War Revenue Act of October 3, 1917, 40 Stat. 300, in which regulation affiliation was stated to exist "when one such corporation owns directly or controls through closely affiliated interests or by a nominee or nominees, all or substantially all of the stock of the other or others, or when substantially all of the stock of two or more corporations is owned by the same individual or partnership, and both or all of such corporations are engaged in the same or a closely related business; or (2) when one such corporation (a) buys or sells to another products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or (b) in any way so arranges its financial relationships with another corporation so as to assign to it a disproportionate share of net income or invested capital."

It is apparent that this regulation embraced affiliations not only on the basis of stock ownership or control but also on that of economic interdependence or domination, and sought to tax the business unit irrespective of the form that the corporate structure assumed or of the method by which control was achieved. See Brownsville Coal & Coke Co. v. Heiner (D. C.) 38 F.(2d) 248; Haig et al., The Federal Income Tax (1921), 188 et seq.

When the bill which was to become the Revenue Act of 1918, H. R. 12863 (H. R. Doc. 1267, Sept. 3, 1918, 65th Cong., 2d Sess., p. 19), was pending before Congress, the Senate Finance Committee thought it desirable to incorporate therein the departmental regulation concerning consolidated returns. In reporting to the Senate, it stated:

"Provision has been made in section 240 for a consolidated return, in the case of affiliated corporations, for purposes both of income and profits taxes. A year's trial of the consolidated return under the existing law demonstrated the advisability of conferring upon the Commissioner explicit authority to require such returns.

"So far as its immediate effect is concerned consolidation increases the tax in some cases and reduces it in other cases, but its general and permanent effect is to prevent evasions which can not be blocked in any other way. * * * (After discussing methods of evasion.) While the committee is convinced that the consolidated return tends to conserve, not to reduce, the revenue, the committee recommends its adoption not primarily because it operates to prevent evasion of taxes or because of its effect upon the revenue, but because *the principle of taxing as a business unit is sound and equitable and convenient both to the taxpayer and to the Government.*" (Italics ours.) Sen. Rep. 617, to accompany H. R. 12863, Dec. 6, 1918, 65th Cong., 3d Sess., pp. 8–9. See, also, Hearings Before the Senate Finance Committee on H. R. 12863, Sept. 26, 1918, 65th Cong., 2d Sess., Pt. II, pp. 21–23. Cf. Appeal of Farmers, etc., Bank, 5 B. T. A. 520, 525. The proposed Senate amendment survived the conference and became section 240 of the Act. Sen. Doc. 385, 65th Cong., 3d Sess., p. 27, sec. 240; H. Rep. 1037; Id., Conference Rep., p. 15; see, also, 57 Cong. Rec. 255. Its legislative history makes clear that it was the intention of Congress to incorporate the existing practice into the statute. See Sen. Doc. 391, 65th Cong., 3d Sess., p. 5. Pursuant thereto, the Commissioner promulgated greatly amplified regulations for the filing of

---

[1] See, e. g., Revenue Act of 1917, 40 Stat. 300, 302, §§ 206–208; Regulations 41, Arts. 42–65; La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998; Revenue Act of 1918, 40 Stat. 1057, 1091, §§ 325, 326; Regulations 45, Arts. 811–901; see Hearings Before the Committee on Ways and Means on Proposed Revenue Act of 1918, Pt. I, p. 344; H. Rep. 767, 65 Cong., 2d Sess., pp. 18–20; Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985; Revenue Act of 1924, 43 Stat. 253, 301, § 281 (c), 26 USCA § 1065 note; Regulations 65, art. 1307; Regulations 69, art. 1305; see Montgomery, Excess Profits Tax, p. 8 et seq.

[2] Regulations 41, arts. 77–78. The substance of these articles was retroactively made part of the act of 1917 by section 1331 of the Revenue Act of 1921, 42 Stat. 227, 319 (26 USCA § 1067). See Montgomery Cotton Mills, Inc., v. United States, 67 Ct. Cl. 169; Brownsville Coal & Coke Co. v. Heiner (D. C.) 38 F.(2d) 248. This latter section made certain additions, here immaterial, concerning partnerships and public service corporations. It should be noted that the requirement of a "same or closely related business" was not carried over into section 240 (b) of the 1918 act, 40 Stat. 1082.

consolidated returns "based upon the principle of levying the tax according to the true net income and invested capital of a single business enterprise, even though the business is operated through more than one corporation." Regulations 45 (1920 Ed.), art. 631.

The statute, however, had not incorporated the entire departmental regulation, but only the first part thereof; the difficulties and ambiguities in the wording of the section were at once apparent. It was recognized in the new regulations that "the words 'substantially all the stock' cannot be interpreted as meaning any particular percentage, but must be construed according to the facts of the particular case." Ownership or control of 95 per cent. of the outstanding voting stock was made conclusive of affiliation, but it was provided that, where ownership or control of 50 per cent. or more existed, a full disclosure of all the facts was to be made. "The same interests" was stated to mean the same individual or partnerships, although no provision was made for the ownership of a corporation or corporations by a combination of individuals and other corporations.[3] Regulations 45 (1920 Ed.), Art. 633.

Before turning to the decisions for further light, it might be well to note briefly the changes made in this section by subsequent acts. Other than to incorporate nunc pro tunc the departmental practice into the act of 1917, the act of 1921 made no change. 42 Stat. 227, 260, § 240(c); see Regulations 62, arts. 631, 633. The act of 1924, sec. 240 (c), 43 Stat. 253, 288 (26 USCA § 993 note), removed one ambiguity by requiring *ownership* of at least 95 per cent. of the voting stock of the corporations concerned,[4] and the

[3] This appears to have been the situation in Great Lakes Hotel Co. v. Commissioner, 30 F. (2d) 1 (C. C. A. 7th), and in Pelican Ice Co. v. Commissioner, 37 F.(2d) 285 (C. C. A. 5th.)

[4] The House Bill provided for 85 per cent. stock ownership in place of "the indefinite and vague language of the existing law." H. Rep. 179, 68 Cong., 1st Sess., Feb. 11, 1924, to accompany H. R. 6715, p. 24. The Senate increased this to 95 per cent. Sen. Rep. 398, Id., April 12, 1924, p. 29. This form survived the conference. H. Rep. 844, Id., p. 22; see Statement of Changes Made in the Revenue Act of 1921 by H. R. 6715 and the Reasons Therefor (1924), p. 24.

The 1924 act also provided for consolidation of accounts of related businesses, incorporated or unincorporated, at the request of the taxpayer. See H. R. 6715, 68th Cong., 1st Sess., p. 96; 43 Stat. 253, 288.

alternative of "control" was dropped. The elastic phrase "same interests" was retained, but the new regulations interpreted it to include corporations as well as individuals and partnerships. Regulations 65, arts. 631, 633. The subsequent statutes retained this modified form.[5]

(2) In summary, it may be seen from this history of section 240(b) that, although Congress obviously attempted to adopt the existing Treasury practice which considered as affiliated any group of corporations engaged in similar businesses and operated as an economic unit, the statute which finally emerged from the legislative mill predicated affiliation entirely upon *stock ownership or control*. Much of the difficulty in reconciling the conflicting interpretations of the section may be attributed to judicial endeavors to effectuate this unexpressed purpose by reading it into the loose dichotomy of *ownership* and *control* or by stretching the phrase *"same interests."*

(3) The numerous decisions of the Board of Tax Appeals on what constitutes "affiliation" present every variety of opinion. The Board has continually wavered between holding that legal ownership of stock is immaterial, control meaning "actual control, legal or not" (Appeal of Isse Koch & Co., Inc., 1 B. T. A. 625), and holding that conceded actual control under which profits are apportioned, but which is based on friendship or acquiescence instead of stock ownership, is not sufficient. Appeal of Rishell Phonograph Co., 2 B. T. A. 229. It has been stated that control secured through solicited proxies is not affiliation (Appeal of Tunnel R. R., 4 B. T. A. 596), with which holding may be compared its determination of affiliation in the case at bar. The ambiguity of section 240 (b) has been repeatedly recognized and the rule formulated that "each case is a separate problem." Appeal of Midland Refining Co., 2 B. T. A. 292, 295. Little, if any, further guidance may be obtained from this conflicting mass of opinion.[6]

[5] Act of 1926, 44 Stat. 9, 46, § 240 (c), 26 USCA § 993(c); see Regulations 69, Arts. 631, 633, as amended by the Act of 1928, § 501, 45 Stat. 791, 869, now 26 U. S. C. § 993 (c), which introduced a new class of "affiliated" groups of related businesses, both incorporated and unincorporated, section 141 (d), 45 Stat. 831 (26 USCA § 2141); see Regulations 75, Art. 712.

[6] Cf. Appeal of Canyon Lumber Co., 1 B. T. A. 473; Appeal of Baird Machine Co., 2 B. T. A. 1089; Appeal of R. A. Tuttle Co., 1 B. T. A. 1218; Appeal of Mahoning Coal R. R. Co., 4 B.

(4) Section 240(b) has been before the courts in some nineteen cases. From the very outset, the view has been taken that "affiliation" is a matter of judicial construction and not of administrative regulation,[7] and that the Commissioner exceeded his authority in ruling that a definite percentage of stock ownership was conclusive of affiliation. In re Temtor Corn & Fruit Products Co. (D. C.) 299 F. 326, affirmed Schlafly v. United States, 4 F.(2d) 195 (C. C. A. 8th); United States v. Whyel (D. C.) 19 F.(2d) 260; Great Lakes Hotel Co. v. Commissioner, 30 F.(2d) 1 (C. C. A. 7th). Similarly, it was early judicially determined that "stock" meant "voting stock" (In re Temtor Corn & Fruit Products Co., supra; Ice Service Co. v. Commissioner, 30 F.[2d] 230 [C. C. A. 2d]); and that the section was not unconstitutional as being arbitrary (United States v. Whyel, supra). Beyond this, the cases may be grouped in accordance with the answers they furnish to the questions: (a) To what extent is control of stock broader than *ownership;* and (b) how much is "substantially all?" In practice, the answer given to the first question usually makes it unnecessary to deal with the second. And it is immaterial, for present purposes, to inquire whether a particular case involved ownership or control of the stock of corporation A by corporation B, or ownership and control of the stock of both A and B by the "same interests." See Great Lakes Hotel Co. v. Commissioner, 30 F.(2d) 1, 4 (C. C. A. 7th).

(a) Some five cases may be disregarded, since the facts clearly revealed either complete legal ownership of voting stock or complete lack of ownership and/or control.[8]

T. A. 923; Appeal of Stanley Insulating Co., 2 B. T. A. 967; Appeal of Cleveland, etc., R. Co., 4 B. T. A. 1040, and see cases cited 26 USCA § 993, notes 21, 34. A good summary of B. T. A. cases basing affiliation upon actual economic control, no matter how secured, may be found in Ullman Mfg. Co. v. United States, 67 Ct. Cl. 104, 110 et seq.

[7] This, too, despite the fact that consolidated returns were required alone by Regulations 41, promulgated under the act of 1917, which made no provision for affiliated corporations. See Brownsville Coal & Coke Co. v. Heiner (D. C.) 38 F.(2d) 248. Undoubtedly, section 1331 of the act of 1921, supra, note 2, was enacted to cure this defect.

[8] In re Temtor Corn & Fruit Products Co. (D. C.) 299 F. 329, affirmed Schlafly v. United States, 4 F.(2d) 195 (C. C. A. 8th); United States v. Whyel (D. C.) 19 F.(2d) 260; News Pub. Co. v. Blair, 58 App. D. C. 295, 29 F.(2d)

The remaining decisions fall roughly into two classes, those holding that ownership and control are practically synonymous and that affiliation can exist only where substantially the entire beneficial interest in the stock is in the hands of the same individuals or corporations, or one corporation owns substantially all the stock of another, and those holding that actual control of an economic business unit, obtained through stock control based on acquiescence, blood relation, or proxy, is sufficient.

In Lavenstein Corp. v. Com'r, 25 F.(2d) 375 (C. C. A. 4th), which was the first case to review a determination of the Board of Tax Appeals based on section 240(b), two individuals owned the entire stock of two corporations operated as a unit; the stock of the first corporation, together with certain of its assets, had been pledged with creditors. The latter had the right to and did appoint three of its directors. A divided Board denied affiliation; the court, in reversing, recognized the dichotomy in the statute between "ownership" and "control." It conceded that the creditors had "control," but held that the beneficial ownership of the stock which remained in the pledgor-stockholders was sufficient to support affiliation.

In Alameda Inv. Co. v. McLaughlin (D. C.) 28 F.(2d) 81, affirmed on another point, 33 F.(2d) 120 (C. C. A. 9th), without discussion of affiliation, and in Montana Mercantile Co. v. Rasmusson (D. C.) 28 F.(2d) 916, there was insufficient stock ownership, although there was actual control through the acquiescence of minority stockholders. The court denied the existence of affiliation on the ground that the statute required that the beneficial ownership be in the same parties and that actual control, obtained in any other fashion, was immaterial.

This view that substantial identity of interest in the enterprise must exist is perhaps best set forth in two cases decided in the Second Circuit, both reviewing decisions of the Board of Tax Appeals. In Ice Service Co. v. Commissioner (C. C. A.) 30 F.(2d) 230, corporation A owned 68 per cent. of the stock of corporation B; the two companies had the same officers and directors and were operated from the same offices as a business entity. Corporation B was a New York corporation, and under the law of that state the

955; Lafayette-South Side Bank v. Commissioner, 59 App. D. C. 91, 33 F.(2d) 646; National Candy Co. v. United States, 67 Ct. Cl. 75 (under act of 1917).

holders of two-thirds of the shares completely control the company and may cause a dissolution. Nevertheless, the court denied affiliation, pointing out that there was a distinction between control of the corporation and control of the stock, and, relying on the abandonment of the word "control" in later revenue acts,[9] held that actual economic control of the joint enterprise was immaterial. This decision was followed in Com'r of Internal Rev. v. Hirsch & Co., 30 F.(2d) 645 (C. C. A. 2d), in which lack of sufficient actual stock ownership by the same interests in two corporations, one of which was apparently a mere department of the other, was held to preclude affiliation. This interpretation of the statute was followed in Goldstein Brothers Amusement Co. v. White, 33 F.(2d) 787 (D. C. Mass.); National Tank & Export Co. v. U. S., 35 F.(2d) 381 (D. C. S. D. Ga.); and American Auto Trimming Co. v. Lucas, 59 App. D. C. 171, 37 F.(2d) 801. In the National Tank Case, the dominant corporation sufficiently controlled the alleged affiliated company to warrant prosecution for violation of the Sherman Anti-Trust Law; nevertheless, the court held the two companies not to be affiliated. The most recent application is found in Wadhams & Co. v. United States, 67 Ct. Cl. 235, in which corporation A owned all but 20 per cent. of the stock of corporation B, and had priority rights to purchase the outstanding stock; affiliation was likewise denied.

The more liberal view of the statute, namely, that control is more comprehensive than ownership and may be based on proxies, identity of interest, or perhaps mere acquiescence of the minority, was first announced in Great Lakes Hotel Co. v. Com'r, 30 F.(2d) 1 (C. C. A. 7th). In that case one corporation controlled the employees, contracts, funds, and general business policies of four other companies; 71 per cent. of the stock of the first was owned by the dominant company or its employees, 50 per cent. of the second, 71 per cent. of the third, and 95 per cent. of the fourth. The court held the five companies affiliated within section 240(b). A somewhat similar result was independently reached in Pelican Ice Co. v. Com'r, 37 F.(2d) 285 (C. C. A. 5th), in which the control of two corporations admittedly operated as an economic unit

9 The case involved the interpretation of section 240 of the act of 1921 which is a re-enactment of the similar section in the act of 1918. See supra.

was achieved through family relationship; the court held the two companies affiliated within the second subdivision of the statute, on the ground that the essential test was whether the companies were so controlled as to make possible an arbitrary apportionment of profits. Similarly in Ullman Mfg. Co. v. United States, 67 Ct. Cl. 104, one company owned all of the preferred, and 80 per cent. of the common stock of another, the remaining 20 per cent. having been given as part compensation to a salesman in its employ who had given the first company an option thereon. The two companies concededly were operated as a single enterprise, and in these circumstances the Court of Claims held them affiliated, approving a number of decisions of the Board of Tax Appeals in which affiliation had been based upon control secured by ties of blood, friendship, and/or interest.

(b) It will be seen from the foregoing cases that the ambiguity inherent in the words "substantially all" is resolved according to the view taken of the necessity for actual legal or beneficial ownership of stock. In the usual situation, illustrated by the case at bar, there is actual legal or beneficial ownership of a considerable percentage of stock, generally 50 per cent. or more, and "control" in some fashion either of the remaining voting stock or of the actual conduct of the business. Enough shares may thus be included in "control" to amount to "substantially all." Consequently, a determination of the first question usually resolves the second.

(5) After an intensive study of the history of section 240(b) of the act of 1918 and the conflicting interpretations which have been given it, we have arrived at the following conclusions: While the underlying purpose was to incorporate the departmental regulation purporting to tax as an economic unit any group of companies so operated as to make arbitrary apportionment of income possible, nevertheless Congress made determinative not actual control of the related companies, or of the subsidiary by the parent company, but the substantial *ownership* or *control* of their *stock*, or of the *stock* of the subsidiary by the parent company. Under a reasonable interpretation of the statute, the stated underlying purpose cannot be given full effect, although, of course, the elimination, in subsequent acts, of the alternative of "control," would not affect the interpretation to be given to the act of 1918.

Applying these conclusions to the case at bar: We find that the two corporations, alleged to have been affiliated and so found by the Board of Tax Appeals and the District Court, were concededly operated as a single interurban road, that there was a complete identity of control of the businesses, and that the joint operating expenses were arbitrarily apportioned. Defendant actually owned 70.9 per cent. of the stock of the Ashtabula Company, and voted, by means of solicited proxies, over 99 per cent. of the stock that was voted at the annual meetings. This stock, however, constituted only 77 per cent. to 84 per cent. of the total issue—which cannot be deemed "substantially all" of the sole class of stock issued by the subsidiary corporation, within the fair meaning of the act.

Commissioner of Internal Rev. v. John Shillito Co., 39 F.(2d) 830, decided by this court April 10, 1930, presented a very different situation. There, the stock was one-half common and one-half preferred; here it was all of one class, common. There, though the preferred stock had voting rights, nevertheless the interest of the preferred stockholders in their corporation was fixed, certain, and unchangeable; it was unaffected by the relative tax liabilities of the two companies. Here, the rights of the minority stockholders could be and were materially affected thereby, as well as by the manner in which the majority interest could cause the two companies to deal with one another financially and otherwise. There the fact of "a control of closely affiliated interests," the minority ownership of preferred stock, was clearly evidenced by grant of proxies of the entire minority interest to a committee, the chairman of which was the head of the controlling corporation; here a large part of the minority interest gave no proxies whatsoever.

We give no consideration, however, to the proxy stock. Even if it might be thought that these proxies in this case constituted, pro tanto, such stock control as section 240(b) contemplates, yet, clearly, there was neither ownership nor control of any kind over the other 16 per cent. to 23 per cent. of voting stock. While the grant of proxies by some and the failure by others to vote at the annual meetings might be deemed an acquiescence in defendant's *economic control* of the Ashtabula Company, that, in our judgment, and under the great weight of the decisions, does not suffice for affiliation.

In these circumstances a finding of affiliation cannot be sustained.

Reversed and remanded.