**GOLDEN CYCLE CORPORATION et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 332.

Circuit Court of Appeals, Tenth Circuit.
July 30, 1931.

Wm. V. Hodges, of Denver, Colo. (D. Edgar Wilson and Henry C. Vidal, both of Denver, Colo., were with him on the brief), for petitioners.

John H. McEvers, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Percy S. Crewe, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge (after stating the facts as above).

At the threshold of this case stands the question of the interpretation of the transaction of January 15, 1917. The Pikes Peak Consolidated Fuel Company was organized that day; to it the Cycle Corporation transferred properties worth $1,350,000 and received therefor stock worth that amount. These properties had cost about $200,000. If the Consolidated Company was not affiliated within the meaning of the 1917 regulations —if it was a legal stranger as petitioners contend—then there was a realized profit in the transaction of more than a million dollars, a profit which increased the undivided profits or surplus account of the Cycle Corporation, and likewise its invested capital. If a corporation owns two hardware stores, and sells one of them to a stranger at a profit for cash, and leaves the cash in its business, its undivided profits and its invested capital is increased by the amount of the profit. The relationship of the Cycle Corporation to the old Pikes Peak Fuel Company is of assistance in arriving at the actual relationship of the two corporations after January 15, 1917.

In determining the question, it should be remembered that in taxing matters in particular, we must have regard "to the very truth of the matter, to substance and not to form." Eisner v. Macomber, 252 U. S. 189, 211, 40 S. Ct. 189, 195, 64 L. Ed. 521, 9 A. L. R. 1570; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 174, 46 S. Ct. 449, 70 L. Ed. 886.

Were these corporations affiliated after January 15, 1917? In the first place the Commissioner found an affiliation in 1917; otherwise his deficiency letter would not have included 1917 taxes. The Board of Tax Appeals held that the Commissioner so found,

and approved. A heavy burden is on the petitioners to prove that such finding of the Commissioner was "plainly arbitrary." Lucas v. Structural Steel Co., 281 U. S. 264, 50 S. Ct. 263, 74 L. Ed. 848; Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385. And by repeated decisions it has been held that findings of the Board of Tax Appeals will not be set aside if they are sustained by competent and substantial evidence. Prey Bros. Live Stock Comm. Co. v. Commissioner (C. C. A. 10) 36 F.(2d) 326. Furthermore, we think the record discloses affiliation in 1917 and long prior thereto. The record discloses that coal is used in the reduction of gold ore. Now that in itself does not relate the coal business to the gold business. But one engaged in the business of gold reduction can, by going into the coal business, broaden the scope of its gold reduction business, just as many automobile manufacturers have broadened the former scope of automobile manufacturing to include all steps in manufacture from the mining of ore, through the refining of steel, to the assembly of parts. The gold reduction business can be conducted in a simple way; or it can be broadened to include all steps in it, from the mining of ore and coal to the time when the refined product is delivered. The record discloses that the Cycle Corporation long considered that the production of coal was a step in its process. Prior to 1913 it was buying coal lands and interests in a company engaged in the mining and sale of coal. Moreover, the record stipulates that the business of the Cycle Corporation is not simply gold-ore reduction; it includes the "holding of the capital stock of all its subsidiaries." The truth is that the Cycle Corporation considered the supply of fuel as an integral part of the business of gold reduction; it acquired coal lands; and it acquired the original Pikes Peak Fuel Company, long before 1917. What it did in January, 1917, was to wipe out the old corporate structure and a bagatelle of outstanding common stock and bonds, and set up in its place a new and simpler corporate structure. As to the Cycle Corporation, the coal business was not only "closely related" within the meaning of the 1917 regulation—it was a department of "the same" business. The 1917 transaction set that department off into a new corporate structure. No profit was realized in bringing about this change in the corporate structure, unless perchance it be the negligible item of the elimination of 1 per cent. of the common stock, which rode behind $246,500

of bonds and 5,000 shares of preferred stock. By so doing, the investment in the properties was not increased by a million dollars, or by anything.

Insurance & Title Guarantee Co. v. Commissioner (C. C. A. 2) 36 F. (2d) 842, is cited as contra. The case is readily distinguishable. There the parent corporation transferred properties which had cost it $15,000 to a newly organized company in exchange for all of its shares, which were worth $35,000. These shares were immediately distributed to the stockholders of the parent company. The court sustained the Commissioner in assessing an income tax against the parent corporation. It will be seen that the parent corporation completely severed itself from the ownership of the properties, and did not, after the transaction, own any of the shares of the subsidiary, while in the case at bar it owned them all. The corporations were not affiliated in the cited case, except momentarily; here they were affiliated throughout the taxable years. In the cited case, the substance of the transaction was an outright sale of the properties; the profit did not remain as a part of the surplus of the seller, but was distributed to the stockholders as a realized profit.

For these reasons we treat the case as one where the Cycle Corporation owned properties in which it had invested approximately $200,000, and which had so appreciated in value that in 1917 they were worth $1,350,000; and we treat the 1917 transaction as one whereby this department of the business of the Cycle Corporation was changed over from the old to the new Fuel Company. So treating the situation, we approach the principal contention of the petitioners, to wit, that affiliation in 1917 or before is immaterial; that only the years 1918 and 1919 are here involved, affiliation under the 1918 statute being conceded; that the proper method of computing the invested capital of affiliated corporations is to ascertain the invested capital of each, and, after eliminating duplications, add them; that there was an actual value of $1,350,000 in these fuel properties in 1918 and 1919; that there is no authority in law for ignoring this value; that it must be considered either as invested capital of the Consolidated Fuel Company, embarked and risked in the business, eliminating from the invested capital of the Cycle Corporation its investment in that stock as a duplication; or, if the Consolidated Company's invested capital is treated as $200,000, the original cost of the properties,

then the Cycle Corporation's invested capital must be increased by the profit passed to surplus.

The Revenue Acts for the years in question laid an additional tax on net income in excess of an amount which was supposed to represent a normal profit in normal times. This normal profit was calculated on "invested capital." Section 326 of the Revenue Act of 1918 (40 Stat. 1092) defines invested capital as—

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus;

* * *

"(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year."

The theory of the excess profits tax is to recapture a part of the unusual profits attributable to the activities of the war. If that theory is of practical value, normal profits must be figured on investment, for, if a normal return is figured on abnormal and inflated war-time values, then an abnormal and not a normal profit is taken as the starting point. The phrase "invested capital" means capital put in either by stockholders or by the corporation reinvesting its earnings, and does not mean the increment to capital accruing by appreciated values. The statutory definition excludes the idea of considering appreciated value as a part of the capital invested; and this has been settled in La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998. In that case a mining company bought lands in 1904 for $190,000. Exploration disclosed large ore bodies, and in 1912 the lands were worth $10,000,000. In 1912 this appreciated value was capitalized and a stock dividend declared and paid out of the surplus so arising. The company claimed their invested capital in 1917 should include the $10,000,000. The court held that the capital invested in such lands was the $190,000 paid for them in 1904, plus moneys expended in development, and stated that the statute, and the

reasons for its enactment, "distinctly negatived any allowance for appreciation in value"; that the statute cannot be construed "as including within the definition of invested capital any marking up of the valuation of assets upon the books to correspond with increase in market value, or any paper transaction by which new shares are issued in exchange for old ones in the same corporation, but which is not in substance and effect a new acquisition of capital property by the company."

The amount of tax assessable against a particular business depending so largely upon its invested capital, and the tax rates being graduated, the total tax payable could be lessened by distributing the ownership of the properties of the business, and by allocating its income. The corporation laws afforded a simple and lawful method of distributing the legal ownership of properties and of allocating income, without disturbing the relative rights of the stockholders. To prevent this practice, the Treasury Department, in 1917, promulgated Regulation 41, article 78 (confirmed by section 1331, Revenue Act 1921 [42 Stat. 319]). That regulation required affiliated corporations to file consolidated returns of their net income and invested capital, and provided that in such case "the total tax will be computed in the first instance as a unit upon the basis of the consolidated return and will be assessed upon the respective affiliated corporations in such proportions as may be agreed among them. If no such agreement is made the tax will be assessed upon each such corporation in accordance with the net income and invested capital properly assignable to it."

Regulation 41, article 77, provides that corporations will be deemed to be affiliated "(1) when one such corporation owns directly or controls through closely affiliated interests or by a nominee or nominees, all or substantially all of the stock of the other or others, or when substantially all of the stock of two or more corporations is owned by the same individual or partnership, and both or all of such corporations are engaged in the same or a closely related business; or (2) when one such corporation (a) buys from or sells to another products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or (b) in any way so arranges its financial relationships with another corporation as to assign to it a disproportionate share of net income or invested capital."

Section 240 of the Revenue Act of 1913 (40 Stat. 1082) required that affiliated corporations make "a consolidated return of net income and invested capital" for the purposes of both excess-profits and income taxes; and corporations were deemed to be affiliated if one corporation owned or controlled "substantially all the stock of the other."

There is no obscurity as to the purpose of these statutes and regulations. Their purpose was to prevent corporations from avoiding the payment of their share of the war taxes by the device of affiliation. When the 1918 act was before Congress, the chairman of the Finance Committee recommended its passage "because the principle of taxing as a business unit what in reality is a business unit is sound and equitable." The ranking minority member of the Committee joined in the recommendation, saying, "It is impossible to determine the true profits of such a combined enterprise except by treating the enterprise as a unit and disregarding the incidental placing of different branches in legally separate corporations." The statutes and the regulations have been many times construed. The Eighth Circuit held that their purpose "was to forestall such manipulation of profits * * * as would prevent the government from ascertaining correctly, and from collecting the sums justly due it, from excess profit taxes, of the controlled and affiliated corporations." Schlafly v. United States, 4 F.(2d) 195, 200. The Seventh Circuit has held their purpose was "to wipe out the artificial legal barriers of separate corporate entities * * * and treat the affiliated corporations as a single unit." W. S. Bogle & Co. v. Commissioner, 26 F.(2d) 771, 772. The Sixth Circuit has held that their purpose was to "tax as an economic unit any group of companies so operated as to make arbitrary apportionment of income possible." United States v. Cleveland, P. & E. R. Co., 42 F.(2d) 413, 418. The Fourth Circuit has held "that what was in fact one business should be taxed as one business, notwithstanding that it might be operated by two or more corporations * * * and that * * * the tax on the business should not be * * * diminished because of division of income which, if allowed, might result in evasion of the higher rates of the graduated tax." Lavenstein Corporation v. Commissioner, 25 F.(2d) 375, 376. The Second Circuit has held that the theory underlying them "is that the income and invested capital are really the income and capital of a single enterprise, though carried on through

the instrumentality of several corporations." Ice Service Co. v. Commissioner, 30 F.(2d) 230, 231. See, also, opinion of Judge Booth, in Fidelity Nat. Bank & T. Co. v. Commissioner (C. C. A. 8) 39 F.(2d) 58.

These authorities amply sustain the proposition that appreciation in the value of property cannot be taken into account in computing invested capital, either directly, or indirectly through the device of transferring properties to an affiliated corporation. Yet this is exactly what the petitioners are attempting to do. The Cycle Corporation owned these coal properties for many years; its capital invested therein was about $200,000. It seeks to increase that invested capital to $1,350,000, not by investing another million dollars in the enterprise, but by causing the properties to be transferred from one subsidiary corporation to another. This is what the statutes were designed to prevent; it is what the decisions cited say may not be done.

The petitioners urge, with vigor and earnestness, several reasons in opposition. It is argued that the transfer was made in 1917, before the regulation as to consolidated returns was adopted, and before the tax years in question. The 1918 law does not purport to except corporations affiliated in prior years, and it would be manifestly unfair to so discriminate. In La Belle Iron Works v. United States, supra, the new stock was issued in 1912; in Lavenstein Corporation v. Commissioner, supra, the tax was for 1919 and 1920, and the affiliation was in 1917. A case, closely parallel in its facts, is Autosales Corporation v. Commissioner (C. C. A. 2) 43 F.(2d) 931. The tax years involved were 1917, 1918, and 1919. A predecessor of the petitioner acquired, in 1911, all of the capital stock of the Weighing & Sales Company. The petitioner claimed, as part of its invested capital, $1,350,000, the value of the stock of the Weighing & Sales Company. Instead, the court disregarded corporate entities, and undertook to ascertain the contribution made to the invested capital of the group when the stock of the Weighing & Sales Company was acquired in 1911.

Petitioners refer us to section 331 of the Revenue Act 1918 (40 Stat. 1095), which provides in substance that, in case of reorganization or consolidation after March 3, 1917, if control of 50 per cent. remains in the same persons, in ascertaining invested capital no asset transferred or received from the prior business shall be appreciated in value unless paid for at the higher value. From this it is argued that, on transfers made to subsidiaries prior to March 3, 1917, appreciation in value may be computed in ascertaining invested capital. We are not impressed by the argument. When statutes are plain, they are not lightly to be set at naught by negative inferences drawn from other sections. This section is in the same act that requires consolidated returns from all corporations owning "substantially all" the stock of another. Congress apparently saw no conflict between this section with its requirement of "substantially all" and without a date limit, and section 331 with its "50% or more" requirement and a date limit. No court has declined to enforce the provisions as to affiliated corporations because the affiliation took place prior to March 3, 1917. In Autosales Corporation v. Commissioner, supra, the affiliation took place in 1911; in Lavenstein Corporation v. Commissioner, supra, the affiliation was in March, 1917; that court thought the date in March of no significance, for it is not given. We read the two sections as applicable to different conditions; but, whether there may be an overlapping or not, we agree with the statement of the Second Circuit, in treating of the "reorganization, merger, or consolidation" phrase in section 202(b) of the Revenue Act of 1918 (40 Stat. 1060) that "at any rate it is not enough to change the entire pattern of the exemption, so as to cover such a transaction as this." Insurance & Title Guarantee Co. v. Commissioner, 36 F.(2d) 842, 844.

It is apparent that, if the formula proposed by petitioners of a separate computation of invested capitals be adopted, the whole statutory system to prevent the inclusion of appreciated values by affiliation is scrapped. Any corporation could do what La Belle Iron Works v. United States, supra, holds cannot be done, by the simple expedient attempted here, of transferring to one or more of its subsidiaries part or all of its appreciated assets. No authority is cited supporting this frontal attack on the statutory plan, except an isolated sentence from W. S. Bogle & Co. v. Commissioner, supra, and an inference drawn from the section (240) of the Revenue Act of 1918 dealing with consolidated returns, which provides that a corporation organized after August 1, 1914, having wartime contracts—a war baby— "shall be separately assessed on the basis of its own invested capital." While we see no need of resorting to inferences to get at the intent of this legislation, such inference as

may be derived from this section bears directly against petitioners. If the plan of Congress was that the invested capital of all affiliated corporations was to be separately computed, as petitioners contend, it was futile to specifically provide for a separate computation of the invested capital of the so-called "war babies."

We conclude that the Commissioner was right in declining to acknowledge that the invested capital of the group was actually increased by the manipulations of January 15, 1917, and in declining to reduce the taxes accordingly.

The order of the Board of Tax Appeals is affirmed.