# CROWDER v. ALLEN–WEST COMMISSION CO.

(Circuit Court of Appeals, Eighth Circuit.  March 30, 1914.)

## No. 4036.

### *(Syllabus by the Court.)*

**1.** BANKRUPTCY (§ 312\*)—DISALLOWANCE OF CLAIM—GROUNDS—FRAUD CONNECTED WITH PRIOR COMPOSITION.

In 1899 H. made a composition agreement with his creditors and an agreement with A., one of them, which was unknown to the others, to pay his claim in full in consideration of his loan to H. of the money required to pay the other creditors the composition percentage of their claims, and in 1910 he was adjudged a bankrupt.  *Held,* these facts furnish no ground for the disallowance of A.'s claim against the estate of the bankrupt because the composition creditors never rescinded the voidable composition and had no cause of action against A., and H., the debtor, had voluntarily paid, after the execution of the composition, the moneys loaned him by A. to pay the other creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496–500; Dec. Dig. § 312.\*]

**2.** COMPOSITIONS WITH CREDITORS (§§ 13, 22, 29\*)—ENFORCEMENT—RESCISSION.

Such a composition agreement, while executory, is not enforceable and after execution is voidable, not void, and creditors may rescind it and return, if practicable, to their former position, but they have no other remedy.  The debtor may recover the excess above the composition percentage which he pays to the preferred creditor before the execution of the composition or the excess which he is compelled to pay thereafter, but he may not recover the excess which he voluntarily pays it thereafter.

[Ed. Note.—For other cases, see Compositions with Creditors, Cent. Dig. §§ 23–37, 64–67, 87–94; Dec. Dig. §§ 13, 22, 29.\*]

**3.** CHATTEL MORTGAGES (§ 6\*)—STIPULATIONS OF AGENCY—OPERATION AND EFFECT.

A mortgage of merchandise in use in trade and other property in Arkansas, which contains stipulations that the mortgagor's property is conveyed and surrendered to the possession of the mortgagee, that the mortgagor is to act as the agent of the mortgagee in the sale of the stock of merchandise on hand and to be purchased, that he is the agent and representative of the mortgagee in everything pertaining to the business, and that he will make statements and reports of the business and property to the mortgagee as requested, is not an absolute conveyance of the property to the mortgagee and the establishment of the relation of principal and agent between the mortgagee and mortgagor, but is, notwithstanding the stipulations regarding agency, a mortgage only.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 23–41; Dec. Dig. § 6.\*]

**4.** BANKRUPTCY (§ 312\*)—DISALLOWANCE OF CLAIM—FRAUD.

H., an insolvent debtor, made false statements of his financial condition to creditors and commercial agencies and failed to state his debt to his largest creditor from time to time between August, 1899, and December, 1910, when he was adjudged a bankrupt.  A., his largest creditor, knew he was insolvent, but hoped and believed that by loaning him more money it could enable him to make his business so prosperous that he could and would pay his debts.  It continued to loan him money to pay his other creditors and to carry on his business until his debt to it had increased from $7,730.00 on September 1, 1901, to $238,835.40 more than the value of the security it had obtained for it, in December, 1910.  Meanwhile it had taken three mortgages on his property to secure his debt to

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
213 F.—12

it which it had recorded. It had never stated in response to inquiries by mercantile agencies, creditors of H., or others, the amount of his debt to it or its estimate of his financial condition, and had never made any false statements about these matters but had refrained from stating his indebtedness to it or its view of his financial condition. *Held*, A. had not been guilty of any breach of duty to, deceit of, or fraud upon any of the other creditors of Hawks which could or ought to estop it from proving its unsecured debt against the estate of Hawks and sharing in the distribution of its proceeds.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496–500; Dec. Dig. § 312.*]

5. BANKRUPTCY (§ 312*) — DISALLOWANCE OF CLAIM — FRAUD — BREACH OF DUTY.

A creditor must have been guilty of some moral turpitude or some breach of duty whereby other creditors were deceived to their damage to constitute such a fraud as will estop him from sharing with them in the distribution of the proceeds of the estate of his debtor in bankruptcy. A willful intent to deceive or such negligence as is tantamount thereto is an essential element of such an estoppel.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496–500; Dec. Dig. § 312.*]

6. BANKRUPTCY (§ 312*)—DISALLOWANCE OF CLAIM—BREACH OF DUTY—FIDUCIARY RELATION.

A creditor of an insolvent debtor is a competitor of his other creditors. He stands in no fiduciary or contractual relation to them, and he owes them no duty to inform them of his debtor's financial condition or of the amount of his indebtedness to him.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496–500; Dec. Dig. § 312.*]

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

The claim of the Allen-West Commission Company against the estate of J. M. Hawks, bankrupt, was allowed by the District Court of the United States for the Eastern District of Arkansas, in 204 Fed. 309, and T. J. Crowder, trustee in bankruptcy of J. M. Hawks, bankrupt, appeals. Affirmed.

The trustee in bankrupty of the estate of J. M. Hawks appeals from the allowance by the court below of the unsecured claim of the Allen-West Commission Company for $238,835.40. Hawks was adjudged a bankrupt on December 30, 1910, the property of his estate has been sold for some less than $100,000, and the claims of other creditors aggregate about $125,000. The contention of the trustee is that the claim of the commission company should be disallowed because from 1899 until 1910 it conspired with Hawks to conceal his indebtedness to maintain his credit and thereby to defraud his other creditors. The salient facts established in the case are these: The commission company was a cotton factor engaged in the business of loaning money to Hawks and other merchants in the country to enable them to advance money to their customers who were raising cotton so that they could control the shipment of the cotton in their respective communities and send it to the commission company, which sold it on commission and applied the proceeds to the respective debts of these merchants. On August 1, 1899, Hawks was insolvent, and his 27 creditors, one of whom was the commission company, made a composition with him whereby they released him from his debts to them set forth in the composition agreement upon the subsequent payment to them of 40 per cent. of their claims. On August 10, 1899, the commission company and Hawks made a secret contract that the former would loan him the money to pay this 40 per cent. to his other creditors and that he would

pay his debt, which amounted to $3,987.57, to the commission company in full. The commission company loaned Hawks the money, and with it he paid all his other creditors 40 per cent. of his debts to them, and on August 31, 1899, he made a mortgage to that company on a lot he owned in Reyno, Ark., his stock of merchandise valued at $2,500, his store fixtures, 5 horses, 11 mules, his cotton crop on 300 acres, his corn crop on 25 acres, his farm implements, notes and accounts to secure the payment to the commission company of his debt to it of $3,987.57, of a note of $2,500 which he had signed with A. M. Dudgeon and Joseph Dudgeon, of the amounts it should advance to him for all purposes, including its advances to him to pay the 40 per cent. of the claims of the other creditors pursuant to the contract of August 10, 1899, which was specifically referred to in the mortgage and made a part thereof. This mortgage recited that the commission company had agreed to advance money to Hawks to pay these creditors and to purchase goods, and it contained an agreement that Hawks then surrendered and the commission company took possession of the mortgaged property; that Hawks was to act as the agent of the company in gathering and marketing the crops; that in the sale of the merchandise on hand and to be purchased, and in everything pertaining to the business, he was the agent and representative of the commission company; that he was to ship the cotton he picked, or purchased, or received, to the commission company, to be sold by it on account; and that he was to make statements of the business to the commission company as often as requested. The conditions of the mortgage were that if he paid the company the sums it advanced, with 8 per cent. interest, on or before January 1, 1900, and performed the agreement of August 10, 1899, then the mortgage should be void; but that if he failed to perform any of his covenants contained therein, or if he should purchase goods or supplies contrary to the instructions or desire of the company, then it should have the right to take possession of all the property mortgaged and all of the property purchased by Hawks, to sell the same and to apply the proceeds to the payment of Hawks' debt to it, returning the balance to him. The mortgage was speedily recorded, and the commission company continued to loan money to Hawks, to receive and sell his cotton, and to apply the proceeds to the payment of his debt to it until his bankruptcy in December, 1910. The lien of this mortgage of August, 1899, expired, as against other creditors, in 1904. The debt of Hawks to the commission company specified in the composition agreement and the debt for his advance to pay the 40 per cent. to pay the other creditors was paid prior to 1904 by the lawful application of the payments upon the account from the sales of cotton shipped by Hawks to the commission company prior to that time, but by agreement of the parties, and by payment of interest, his debt on account of the Dudgeon note survived and became a part of the claim of the commission company against his estate in bankruptcy.

On May 13, 1908, Hawks mortgaged to the commission company all the real estate he had to secure the payment of the Dudgeon note and his debt to the commission company on open account; on August 6, 1910, he mortgaged to it two other pieces of real estate for the same purpose, and these mortgages were recorded soon after their respective dates.

During the 11 years between the composition in August, 1899, and the bankruptcy in December, 1910, there was a voluminous correspondence between Hawks and the commission company, the burden of which was sharp protests by the commission company against Hawks' large and increasing debt to it and repeated advice and requests that he contract his business and pay his debts. But Hawks increased his business until he was operating several stores. He bought and shipped cotton in large quantities to the commission company and bought and sold other merchandise at his stores. He paid all his other mercantile creditors with the money derived from the sales at his stores and from the money advanced to him by the commission company until in December, 1910, his indebtedness to that company had risen to $250,000, and it discovered by an audit of his books that he was owing large amounts to other creditors, when it ceased to honor his drafts and he was adjudged a bankrupt. From the date of the composition to the bankruptcy he was continuously insolvent, but the commission company hoped and believed that by advancing him more money it could enable him to make his business so profitable that he could and

would pay his debt to it and his debts to other creditors. In this belief it permitted his indebtedness to it to become the following amounts at the dates specified: September 1, 1900, $7,730; September 1, 1901, $53,624.58; September 1, 1902, $61,733.07; September 1, 1903, $63,337.17; September 1, 1904, $83,655.57; September 1, 1905, $98,117.17; September 1, 1906, $105,283.58; September 1, 1907, $134,282.58; September 1, 1908, $148,560; September 1, 1909, $176,714.48; September 1, 1910, $202,242.43; December 1, 1910, $254,490.

On its request Hawks made many reports of his business to the commission company during these 11 years, but he did not truthfully state to it the amount of his indebtedness to other creditors. He made reports to commercial agencies and other creditors, but he never truthfully told them the amount of his indebtedness to the commission company. The commission company knew that he did not state to others his indebtedness to it, and, while it stated on inquiry that he was indebted to it, it always refrained from telling to any one during that time the amount of his indebtedness to it. Nevertheless, it made no false statement about this matter or about the property or financial standing of Hawks. For example, in reply to an inquiry about selling a bill of goods on credit to Hawks in 1901 the company wrote: "We have paid all the bills Mr. J. M. Hawks has drawn on us. We think he has paid his mercantile bills as promptly as anybody. Most of our cotton shippers who do business with us owe us money. We do not think you would run any risk in filling this bill for Mr. Hawks, but you must be your own judge of credits, as we never profess to judge credits for other people and we would rather you would use your own sources of information like we do, instead of referring to us." Being shown a statement of Hawks to R. G. Dun & Co. which placed the value of his assets $40,922.29 and his liabilities $3,000 on October 5, 1903, when he owed the commission company over $63,000, that company said he owed it some money; that it was unable to specify the amount as he had been and was shipping it cotton; that he carried a good stock and in the past two years made money on cotton, but that it was unable to give an estimate of his worth, and that it did not consider his worth over one-half what he claimed. In July, 1902, the company prepared a letter from Hawks to it which he signed and sent to the company, to the effect that the company had loaned him money whenever he asked for it and had promised to help him out of his indebtedness; that he desired, in case of his death owing the company, that it should take possession of his business and either continue it or close it down, and he agreed that he would turn his business over to it at any time it showed no gain, and it seemed useless for the company to continue paying out money in the hope of his balancing the account. And he frequently expressed willingness to surrender his property and his business to the company. There are other facts and circumstances disclosed in the record, but none which modify the conclusion which those recited compel.

Dwight D. Currie and S. L. Swarts, both of St. Louis, Mo. (Lyon & Swarts, of St. Louis, Mo., on the brief), for appellant.

W. B. Smith, of Little Rock, Ark. (John M. Moore and J. Merrick Moore, both of Little Rock, Ark., on the brief), for appellee.

Before SANBORN and CARLAND, Circuit Judges, and RINER, District Judge.

SANBORN, Circuit Judge (after stating the facts as above). Counsel for the trustee present three reasons why the decree allowing the claim of the commission company should be reversed or modified: (1) That in August, 1899, it made an agreement with Hawks to loan him the money to pay the 40 per cent. of the claims of his other creditors which was to be paid under the composition agreement, in consideration that Hawks promised to pay his debt for $3,987.57 to it specified in that agreement in full; (2) that after the mortgage of

August, 1899, and pursuant to the terms thereof, the commission company was the principal and Hawks its agent in the purchase and sale of the property and the conduct of the business Hawks handled; and (3) that the commission company conspired with Hawks to defraud his other creditors by concealing his indebtedness to it and sustaining his credit so that they were induced thereby to sell him goods upon credit.

The lucid and exhaustive opinion of the court below has demonstrated its familiarity with the voluminous evidence in this case and its clear comprehension of the law and the facts which conditioned its decision. In re Hawks, 204 Fed. 309. Reference is made to that opinion for a more extended discussion of the case and citation of the authorities than it is necessary to present here, and this opinion will be confined to an expression of the view of this court upon the conclusions of the court below which the appeal challenges.

[2] An agreement between a debtor and one of several creditors, who are parties to a composition agreement with the debtor, to release him from their claims for a certain percentage thereof, whereby the debtor agrees to pay his preferred creditor in full in consideration of its loan of the funds requested to pay the fixed percentage to the other creditors, is a breach of confidence and good faith which renders the composition voidable. It does not, however, render it void. It is still valid until avoided, not void until validated. The other creditors may successfully resist its enforcement while it is executory. They may rescind it after it is executed, restore what they have received under it, and, if practicable, return to their position before its execution, or they may retain what they have received under it and affirm it. They have no other remedy; no right of recovery against the preferred creditor. The debtor may recover back the excess which he has paid to the preferred creditor above the fixed percentage before the composition was made, and the excess he has been compelled to pay thereafter. But he may not recover anything which he has voluntarily paid after the composition was made pursuant to his agreement with the preferred creditor. Batchelder & Lincoln Co. v. Whitmore, 122 Fed. 355, 359, 360, 362, 58 C. C. A. 517.

[1] The trustee in bankruptcy in this case, therefore, may not defeat in whole or in part the claim of this commission company on account of the composition and the agreement of August 10, 1899: First, because he does not represent and cannot act for the creditors who signed that composition, but may act only for the present creditors of the bankrupt, and but a very small percentage of either class is found in the other; second, because the composition creditors had no remedy, but rescission, and they have never rescinded, but by their retention of 40 per cent. of their claims and acquiescence for 11 years they affirmed the composition; third, because the debtor, by permitting the application of the payments made by him on his indebtedness to the commission company according to law in the order of the accrual of the items of that indebtedness, voluntarily paid the debt for the loan to pay the composition percentages and the debt of $3,987.57 specified in the composition agreement many years before his bank-

ruptcy, and by his repeated acknowledgment and giving of security to pay the Dudgeon note, and his inducement of the commission company thereby to loan him the large amounts of money it subsequently advanced to him, he had estopped himself long before the bankruptcy from any relief at law or in equity on account of the composition or on account of his agreement with the company regarding it. There was consequently no equity in the trustee, either as the representative of the debtor or as the representative of the creditors, to defeat or reduce the claim of the commission company against the estate of the bankrupt in this case on account of the composition agreement, or on account of the agreement between Hawks and the commission company in August, 1899.

[3] Was the commission company the principal and Hawks its agent in the purchase and sale of the merchandise and other property and the conduct of the business which Hawks handled between August 31, 1899, and his adjudication in bankruptcy in 1910? The argument for an affirmative answer to this question rests on the stipulations in the mortgage of August 31, 1899, that Hawks' property therein described was then conveyed and surrendered to the commission company; that Hawks was to act as the agent of the company in the gathering and marketing of the crops mortgaged, in the sale of the mortgaged stock of merchandise on hand and to be purchased; that in everything pertaining to the business or connected therewith he was the agent and representative of the company; that he was to ship the cotton picked and received to the company to be sold by it on account; and that he would make statements of the business as requested by the company. The argument is supported by the facts that Hawks did make to the company reports and statements of the business and of the property in his hands frequently and whenever requested by the company; that he shipped the cotton which he collected to it; that the company conducted a voluminous correspondence with him; that it tried to keep intimately acquainted with the business and the property which he was handling; that it advised and requested him frequently and insistently to contract his operations, dictated his letter to it concerning the business and disposition of the property in case of his death or his failure; and that the commission company paid all the drafts which Hawks drew upon it upon any account from August, 1899, to December, 1910. If these were the only facts relevant to this issue, the question under consideration might well be answered as counsel for the trustee contend it should be. But the instrument of August 31, 1899, was not a mere power of attorney to Hawks to act as agent for the company, although it contains the stipulations regarding his agency which have been recited. Nor was it a mere agreement of sale or conveyance of the property it described. On the other hand, it was a complete mortgage which recited that it was made to secure the present and future indebtedness of Hawks to the company, and that was its main purpose to which the stipulations regarding its agency were but auxiliary. It contained the usual condition of a mortgage that, if the debt specified was paid by the 1st day of January, 1900, the instrument should be void, but that, if Hawks failed to fulfill his promises and.

covenants in the mortgage, the company should have the right to take possession of the property, sell it, and apply the proceeds to pay the debt of Hawks to the company, and return the remainder to him. This last stipulation is inconsistent with the theory that the property and the business was already the commission company's and in its possession by the possession of its agent. And when it is considered that at the time this mortgage was made it was the law of Arkansas, where the property and business were situated, that a mortgage of a stock of merchandise in use in retail trade left in the possession of the mortgagor without a provision that he should conduct its sale as the agent of the mortgagee and should account to him for and apply to the payment of his claim the net proceeds of such sale was void, while with such a provision it was valid (Adler-Goldman Commission Co. v. Phillips, 63 Ark. 40, 52, 53, 37 S. W. 297), it is probable that the intention of the parties to this instrument was to assure the validity of the mortgage by the stipulations therein regarding agency and not to transform the commission company from creditor to owner and Hawks from owner and debtor to the agent of the owner of the property and business described. The correspondence between the parties, the reports and statements of Hawks to the company, its requests for them, its endeavor to keep familiar with the business and property he was handling and to secure control of it in case of his death or failure, its advice and request that he curtail his operations and pay his debts are as consistent with the relation of creditor and debtor as with that of principal and agent. Moreover, the account books of the parties, their letters, the mortgages of 1899, 1908, and 1910, which were promptly spread upon the proper public records so that all who wished might know the relation of these parties, treated of them as creditor and debtor, not as principal and agent. The testimony of the witnesses is that they were such, and an examination and consideration of all the evidence has forced the conviction upon our minds that there was no mistake in the finding of the court below that the relation of these parties to each other under the mortgage of August, 1899, and throughout the entire 11 years until the adjudication in bankruptcy in December, 1910, was not that of principal and agent but was that of creditor and debtor, and that Hawks, and not the commission company, was the owner of the property and the business he handled.

[4] Did the commission company conspire with Hawks to defraud his other creditors by concealing his indebtedness to it and sustaining his credit so that they were thereby induced to sell him their goods upon credit? Hawks was insolvent from August, 1899, until his adjudication a bankrupt in December, 1910. Counsel for the trustee contend, and for the purpose of this decision it is conceded, that the commission company knew that he was insolvent during all this time. The record, however, persuades that during all this time, up to the first days of December, that company hoped and believed that he was an honest, industrious, and energetic business man operating in a favorable locality, and that by loaning him more money it could make his business so large and prosperous that he could and would pay off his debts. There is no other rational deduction from the controlling

fact that this company increased its loan to him and enabled him to enlarge and carry on his business and pay his other creditors year by year until, after crediting all the security for its indebtedness which it obtained, that indebtedness rose from $7,730 on September 1, 1900, to $238,835.40 in December, 1910. Meanwhile, it is true, it did not tell inquiring creditors of Hawks, commercial agencies, or other parties, how much he owed it or what its estimate of his financial worth or standing was. It never denied, however, but when questioned always admitted that he owed it money, and it never made any false statement about his indebtedness or financial standing, and it kept spread upon the public records from one to three mortgages, each securing all Hawks' indebtedness to it past, present, and future. Is this course of action such a fraud upon other creditors of Hawks who gave him credit on his false statements of his financial condition, his large business operations, and the acts and silence of the commission company which have been detailed as makes it inequitable for the company to share in the distribution of its debtor's property? In the absence of other evidence than the proof of the claims of all these creditors, the commission company, the largest creditor, would be entitled to share pro rata with the others. The equitable principle upon which it is sought to exclude it is that "he who has done iniquity shall not have equity." But in what way has the company done iniquity? Counsel for the trustee answer: By deceiving the other creditors into the belief that Hawks was solvent and thereby inducing them to give him credit to their damage. But an intent to deceive one to his injury, or knowledge of the falsity of the misrepresentation, or a reckless misrepresentation made in ignorance of the fact is indispensable to actionable deceit or fraud. Union Pacific Ry. Co. v. Barnes, 64 Fed. 80, 83, 12 C. C. A. 48, 51; Western Union Telegraph Co. v. Schriver, 141 Fed. 538, 541, 72 C. C. A. 596, 599, 4 L. R. A. (N. S.) 678; Kahl v. Love, 37 N. J. Law, 5, 6, 7; Polhill v. Walter, 3 Barn. & Adolph. 114, 124.

[5] A creditor must have been guilty of some moral turpitude or some breach of duty by which other creditors were deceived, to their damage, to constitute such a fraud as will estop him from sharing with them in the distribution of the proceeds of the estate of his debtor in bankruptcy. A willful intent to deceive or such gross negligence as is tantamount thereto is an essential element of such an estoppel. Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835; New York Life Ins. Co. v. McMaster, 87 Fed. 63, 67, 30 C. C. A. 532, 536; Daniels v. Benedict, 97 Fed. 367, 380, 38 C. C. A. 592, 605; Farmers' & Merchants' Bank v. Farwell, 58 Fed. 633, 639, 7 C. C. A. 391, 397.

[6] A creditor of an insolvent debtor is a competitor of all his other creditors. He stands in no fiduciary or contractual relation to them and owes them no duty to inform them of his debtor's financial condition, his insolvency, or of the amount of his indebtedness to him. Foster v. McAlester, 114 Fed. 145, 151, 52 C. C. A. 107, 113. There was therefore no fraud or breach of duty in the failure of the commission company to inform the other creditors in this regard. It never made any false statement respecting these matters; whatever it stated was the truth, and no duty rested upon it to state even that, much less

to state more of the truth. It did not use its knowledge to induce other creditors during these 11 years to sell goods to the debtor that from the proceeds of them it might secure a payment of a portion of its claim. On the other hand, it constantly increased its loan and enabled its debtor for 10 years to pay its other creditors with its money, and ceased this course only when it learned that Hawks had incurred a large indebtedness to others when it had supposed and believed that he owed little to any one but itself. A careful review of all the evidence in this case and of all the facts and circumstances which it discloses has satisfied this court, as it did the court below, that the commission company was guilty of no breach of duty to, deceit of, or fraud upon any of the other creditors of Hawks which can or ought to estop it from sharing with the ·other unsecured creditors in the proceeds of his estate.

The decree below must therefore be affirmed.

And it is so ordered.