## GEIST v. PRUDENCE REALIZATION CORPORATION.

### No. 343.

Circuit Court of Appeals, Second Circuit.
Aug. 11, 1941.

FRANK, Circuit Judge, dissenting.

———◆———

Irving L. Schanzer, of New York City, for appellant.

Morris A. Marks, of New York City (Geist & Netter, of New York City, on the brief), for appellee.

Before SWAN, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

The Prudence Company, Inc., and Prudence-Bonds Corporation, wholly owned subsidiaries of the same parent corporation —New York Investors, Inc.—were together engaged in the mortgage-guaranty business. By a common practice, Prudence would lend money on a bond and real property mortgage, which it would assign to Prudence-Bonds. The latter would place them with a public depository and would issue certificates authenticated by the depository of undivided shares of specified amounts in the bond and the mortgage. These certificates would then be sold to the public with Prudence's guarantee attached. The practice is described in Re Westover, Inc., 2 Cir., 82 F.2d 177, and see, also, In re Prudence Co., Inc., 2 Cir., 89 F.2d 689; In re Prudence Co., Inc., 2 Cir., 98 F.2d 559, certiorari denied Stein v. McGrath, 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037; In re Prudence Bonds Corp., 2 Cir., 79 F.2d 212.

This procedure was followed in connection with the issue here involved. Prudence having lent the Zo-Gale Realty Co., Inc., $480,000, the loans were consolidated in 1925 in one bond secured by mortgage of the premises at 202 Riverside Drive, New York City. Prudence immediately assigned the bond and mortgage to Prudence-Bonds, which deposited them with Central Union Trust Company of New York and sold to the public certificates guaranteed by Prudence to the amount of $382,800. The mortgage was thereafter reduced by payment to $390,000. In 1932, Prudence repurchased two certificates in the amount of $800, and otherwise became entitled to one in the amount of $16.67. Whether claims in reorganization proceedings on these certificates totalling $816.67 and on the uncertificated balance of the loan, to wit, $7,200, stand on a parity with, or are subordinated to, the claims of general certificate holders is the question here at issue.

In proceedings for the foreclosure of a mortgage junior to the one received by Prudence, following the mortgagor's default, the property was transferred February 1, 1933, subject to Prudence's mortgage, to Amalgamated Properties, Inc., a subsidiary of Prudence. Reorganization proceedings against Prudence were begun February 1, 1935, and against Amalgamated, March 16, 1936. By an order therein of January 28, 1938, the court approved a transfer by Prudence-Bonds, also in reorganization, to the Prudence trustees of the $7,200 uncertificated portion of the Zo-Gale mortgage, in compromise of other claims. A plan for the reorganization of the Zo-Gale issue was subsequently confirmed, February 19, 1938, and pursuant thereto, title to the mortgaged property was transferred to Geist, petitioner herein, to carry out the plan.

The order of confirmation did not settle, however, the question which had been raised regarding the right of the Prudence trustees to satisfaction of their claims on a parity with other certificate holders. By Paragraph 7 thereof, Geist was forbidden to make distribution of cash or securities on account of these claims unless their right thereto had "been finally adjudicated by a court of competent jurisdiction," and by Paragraph 30, the court retained in itself jurisdiction to decide the question.

Respondent, Prudence Realization Corporation, which succeeded to the interest of the Prudence trustees following the reorganization of Prudence by an order of May 26, 1939, now opposes Geist's petition for subordination of the claims. The court below held, however, that under New York law a guarantor of mortgage certificates who also has an interest in the mortgage cannot share in the collateral until the certificate holders are paid, unless there is a clear reservation in the certificate of a right to share on a parity. Respondent has appealed from the resulting order of subordination against it.

■■■ The New York law to which the district court refers has been established in a series of recent cases dealing with the liquidation of companies engaged in the guaranteed mortgage business. In re Union Guarantee & Mortgage Co., 285 N.Y. 337, 34 N.E.2d 345; Pink v. Thomas, 282 N.Y. 10, 24 N.E.2d 724; In re Title & Mortgage Guaranty Co. of Sullivan County, 275 N.Y. 347, 9 N.E.2d 957, 115 A.L.R. 35, and other cases cited in these decisions. An important issue herein is whether this is primarily a rule of construction of the guaranty in the certificates or is a rule of administration of insolvent estates which violates bankruptcy principles of equal distribution of a bankrupt estate among creditors. If it is a rule of construction, we would follow it as we held in Re Prudence Co., Inc., 2 Cir., 82 F.2d 755, certiorari denied 298 U.S. 685, 56 S.Ct. 958, 80 L.Ed. 1405; and see, of course, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. And if we thus found the guarantee to amount to an actual agreement between two creditors that the claim of one against the debtor should be subordinated to that of the other, we should give that effect to it, as was done in St. Louis Union Trust Co. v. Champion Shoe Machinery Co., 8 Cir., 109 F.2d 313; Bird & Sons Sales Corp. v. Tobin, 8 Cir., 78 F.2d 371, 100 A.L.R. 654; and Searle v. Mechanics' Loan & Trust Co., 9 Cir., 249 F. 942, certiorari denied 248 U.S. 592, 39 S.Ct. 67, 63 L.Ed. 437, even though there appears to be authority contra to the effect that the enforcement of such agreements, not amounting to assignment of a claim, is entirely collateral to the interests of the estate and outside the bankruptcy power. In re Railroad Supply Co., 7 Cir., 78 F.2d 530; In re Goodman-Kinstler Cigar Co., 32 A.B.R. 624; see Nixon v. Michaels, 8 Cir., 38 F.2d 420. Where the state law determines what the actual agreement made by the parties is, and therefore the real basis of their claims in bankruptcy, it must be given effect.

■■■ If, however, the matter is one of insolvent liquidation only, we have a different situation. It is a necessary implication of the requirement of a plan of reorganization that "it is fair and equitable and does not discriminate unfairly in favor of any class of creditors," Bankruptcy Act, former § 77B, sub.f(1), 11 U.S.C.A. § 207, sub.f(1), as it is a corollary of the strict priorities rule of Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, that a plan may not discriminate between different members of the same class of creditors or classify creditors arbitrarily, without due regard to their economic status as defined in their respective claims. See Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099; 49 Yale L.J. 881, 882; 2 Gerdes, Corporate Reorganizations, 1682; Finletter, Bankruptcy Reorganization, 465. Similarly, Bankruptcy Act, § 65, sub. a, 11 U.S.C.A. § 105, sub. a, requires, in liquidation, the distribution of "dividends of an equal per centum" "on all allowed claims, except such as have priority or are secured." Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, 76 A.L.R. 1198; Globe Bank & Trust Co. v. Martin, 236 U.S. 288, 305, 35 S.Ct. 377, 59 L.Ed. 583; Sampsell v. Imperial Paper & Color Corp., 61 S.Ct. 904, 907, 85 L. Ed. 1293. The only departures made from the ordinary rule of equality are based on some very definite equity, such as fraud, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, mismanagement of the debtor by a parent corporation, Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, or conceal-

ment of a claim to the prejudice of another creditor, In re Bowman Hardware & Electric Co., 7 Cir., 67 F.2d 792. In the absence of such an equity, subordination is not a function of the bankruptcy court. Crowder v. Allen-West Commission Co., 8 Cir., 213 F. 177, 184; Sampsell v. Imperial Paper & Color Corp., supra; cf. Moise v. Scheibel, 8 Cir., 245 F. 546.

Notwithstanding the antithesis thus stated, the question might still remain somewhat more extensive than whether the New York rule is a mere rule of interpretation. For if it is a rule of law, but one attributing a certain legal result to a contract, that result must still be the basis of the bankruptcy claim—just as, for example, a New York contract of insurance must legally incorporate in itself provisions which may be directly opposed to the parties' actual intent. American Lumbermens Mut. Cas. Co. v. Timms & Howard, Inc., 2 Cir., 108 F.2d 497, 502. It is still the difference between finding out what the contract claim is as opposed to adjusting priorities among ascertained claims. But, however far the answer to such a question might take us, we need not determine it here, for the New York decisions emphasize that it is the intent of the parties which they are seeking to ascertain with the aid of a "presumption of intent derived from the guaranty of the assignor." The language just quoted is from In re Title & Mortgage Guaranty Co. of Sullivan County, supra [275 N.Y. 347, 9 N.E.2d 960, 115 A.L.R. 35], where the present Chief Judge has made the most extensive analysis of the subject of any of the cases and where he discusses not merely New York, but general, precedents. He finds that the rule "is supported by the weight of authority in this and other jurisdictions and produces an equitable result in accordance with the intent of the parties," that "the decisive test in every case is the intention of the parties, either as actually expressed, or as derived from the natural equity of the situation," and that "a presumption of such intent is derived from special equities," of which the guaranty seems to be the one most noted. 275 N.Y. pages 353–355, 9 N.E.2d page 960, 115 A.L.R. 35. In thus stating the basis of the rule he expressly eliminates "avoidance of circuity of action" as its basis in this State; and he holds that the mere assignment of part of the mortgage without any guaranty is insufficient to raise a presumption against parity, citing Title Guarantee & Trust Co. v. Mortgage Commission, 273 N.Y. 415, 428, 7 N.E.2d 841, 847, where such an assignment was held to permit the assignor to share pro rata with the assignee in the proceeds of insufficient surety. The most recent cases have followed the same principle; indeed, in the latest case of all, In re Union Guarantee & Mortgage Co., supra, certain language of the depository agreement was assumed to be adequate to achieve such parity but for the fact that the guarantor had cancelled its acquired certificates and had not issued others in place of them.

There is considerable authority in other jurisdictions to similar effect. In re Philippi, 329 Pa. 581, 198 A. 16; Appeal of Fourth Nat. Bank, 123 Pa. 473, 16 A. 779, 10 Am.St.Rep. 538; Donley v. Hays, 17 Serg. & R., Pa., 400; Worrall's Appeal, 41 Pa. 524; Fidelity Trust Co. v. Orr, 154 Tenn. 538, 289 S.W. 500; and see, also, Whitehead v. Morrill, 108 N.C. 65, 12 S.E. 894; Cannon v. McDaniel & Jackson, 46 Tex. 303; Dixon v. Clayville, 44 Md. 573. The leading authority to the contrary is Kelly v. Middlesex Title Guarantee & Trust Co., 115 N.J.Eq. 592, 171 A. 823, affirmed 116 N.J.Eq. 574, 174 A. 706, much relied on by respondent herein. The reasons assigned for the rule have varied between the effect of the guaranty as evidence of an intent to grant the assignees priority, as in the Pennsylvania and Tennessee cases cited, or, as in Dixon v. Clayville and apparently the two cases cited before it, to avoid a circuity of action in suits by the general creditors against the guarantor—a reason, as is pointed out in the Kelly case, which loses its force where the guarantor is insolvent. A vigorous criticism of the rule as applied to an insolvent assignor appears in 47 Yale L.J. 480–483, where it is pointed out that the rule may give the assignees a preference at the expense of unsecured creditors, and, in the case of a large holding of a single issue, prejudice other customers of the assignor in favor of the holders of this particular issue. Compare, also, 37 Col.L.Rev. 1010; 34 Col.L.Rev. 663, 678; 14 N.Y.U.L.Q.Rev. 259; 19 R.C.L. 659, 660. In these comments it appears to be assumed that the rule is one of intent or construction of the guaranty.

Whether or not we might quarrel with the rule as an original or a general proposition, we see no occasion to do

so here. Creditors of different New York mortgage-guaranty companies ought to receive similar treatment, without respect to the tribunal in which liquidation occurs, for certainly their respective investments were made under substantially identical conditions. Moreover, there appear to be no particular equities in favor of either the original guarantor or those who claim through it, including its successor, the respondent herein, which took with full notice of the situation from the reorganization proceedings generally and especially in view of the explicit reservation of the question in the confirmation of the debtor's reorganization. After all, all parties to these proceedings, guarantor, mortgagee, and debtor, are interconnected companies; and as a matter of practical equity so far as the public purchasers of certificates are concerned, it is only just that their mutual claims among each other should be subordinated until the claims of their customers have been satisfied. Moreover, the wording of the contracts here is such as to indicate an intent that the guarantor should not have parity with the others. For the agreement with Prudence-Bonds provides that it "may for its own corporate account, be the holder or pledgee of similar shares in said bond and mortgage," whereas in Prudence's guaranty such a provision is almost pointedly lacking. Under Pink v. Thomas, supra, an actual agreement against parity might well be found.

A final question arises as to the claim on the uncertificated indebtedness of $7,200, for that, at the time of the debtor's bankruptcy, was nominally in the name of Prudence-Bonds, which, in the light of the agreement just quoted, as well as Title Guarantee & Trust Co. v. Mortgage Commission, supra, would itself be entitled to share on a parity with the certificate holders, since it was not a guarantor. But the record shows without dispute that Prudence-Bonds when it took the original assignment from Prudence did not give any money value for the bond and mortgage and could not be expected to, as it had no such assets as would justify a loan in its own right of this amount. Compare In re Westover, Inc., supra; In re Prudence Bonds Corp., supra. And later collections of interest applicable to this uncertificated indebtedness went to Prudence. On the basis of such facts appearing of record the court below held that Prudence was the actual and equitable owner throughout, and hence the New York rule was applicable. We think this conclusion sound and in accordance with the undoubted realities of the relations between the parties here. On this basis both the uncertificated portion of the indebtedness and the certificates bought by Prudence prior to any of the reorganization proceedings were properly declared subordinate to the claims of the public certificate holders.

Affirmed.

FRANK, Circuit Judge, dissents with opinion.

FRANK, Circuit Judge, (dissenting).

There are two factual aspects of this case to which, I think, the majority has given insufficient attention:

(1) Prudence, the guarantor, itself is bankrupt. Its creditors are all general creditors, i.e., holders of certificates of several different issues (including the Zo-Gale issue) which Prudence had guaranteed, their claims all being based on the obligations of Prudence on those guarantees. Among the assets of the Prudence estate are the Zo-Gale certificates held by Prudence. The majority, by subordinating Prudence's claim in the Amalgamated proceedings, is thus preferring the claims of one group of Prudence's general creditors —the holders of the Zo-Gale certificates —to those of Prudence's other general creditors, i.e., the holders of other certificates guaranteed by Prudence, by giving assets to the Zo-Gale holders which would otherwise be divided among all of Prudence's general creditors.

(2) If the certificates which are the basis of Prudence's claim against Amalgamated had not been repurchased from their holders by Prudence,[1] or if certificates had been issued against the uncertificated interest here involved and had been sold to the public, the holders of those certificates could have proved them, in the reorganization of Amalgamated, on a parity with the Zo-Gale certificates which are now, in fact, so held by the public. It is only because of the fortuitous circumstances that Prudence, under conditions which no one even intimates were improper, repurchased

[1] Or if they had again been resold, before the reorganization, to the public.

the certificates, and failed to sell, of its own choice, the uncertificated interest, that the public holders of the Zo-Gale issue claim that they are entitled to a larger share of the available assets than they would have received if all the certificates were publicly owned.

Those facts are, to my mind, controlling: As the majority points out, the usual federal rule of bankruptcy administration would require that Amalgamated's assets should be equitably distributed, without such a preference, among all claimants, Prudence[2] as well as the public certificate holders. I am satisfied to take as my text the majority's words: "The only departures made from the ordinary rule of equality are based on some very definite equity. * * * In the absence of such an equity, subordination is not a function of the bankruptcy court." I search in vain both the record and the majority opinion to find any evidence of such an equity. I find, rather, that the preference is markedly inequitable. There is also the striking fact that the entire case for subordination rests upon the mere accidental repurchase of the certificates; because of this adventitious fact, subordination is a windfall to the other holders of the Zo-Gale certificates and the other creditors of Prudence—which, so far as appears, retained the uncertificated interest and repurchased the certificates solely as an investment, and held them in place of either cash or other securities—find the assets of Prudence depleted.

The only equity suggested by the majority opinion to justify the preference is that the companies are interconnected so that "it is only just that their mutual claims among each other should be subordinated until the claims of their customers have been satisfied." I am unable to follow that reasoning. This is not at all a case of a parent company asserting a creditor claim against an insolvent subsidiary which it had organized or operated for its own benefit, as in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543,

83 L.Ed. 669 and related cases.[3] There is no suggestion that Prudence interfered in the affairs of Zo-Gale Realty Company or mismanaged it; Prudence merely made Zo-Gale, an autonomous entity, a loan, receiving in return a bond and mortgage, some participation certificates in which Prudence guaranteed and sold to others.

The majority opinion makes an additional argument: Appellant, it says, "took with full notice of the situation" because the issue of subordination was reserved in the Zo-Gale reorganization proceedings. But that sort of notice is inefficacious to create equities, although it would preserve them if they already existed: Appellant represents the interests of Prudence's creditors; it was created long after they became creditors; they became creditors without any such notice; the notice to which the majority refers served merely to keep open for future decision the question, first raised in the Zo-Gale proceedings, of whether or not, because of facts previously occurring (including no such notice), there should be a subordination.

Since I am unable to find "some very definite equity" in favor of subordination —in the absence of which, as the majority opinion says, "subordination is not a function of the bankruptcy court"—I would follow the normal principle of bankruptcy administration, that "equality is equity." So far as the New York rule applies to a situation where the guarantor is itself solvent, I regard it as both fair and practicable, and see no reason why the federal courts should not adopt it.[4] But *it becomes a totally different rule when, as here, the guarantor itself is a bankrupt; then the problem which confronts the federal courts is one of equitable distribution, under the Bankruptcy Act, of the insufficient proceeds of a guaranteed obligation among all the guarantor's creditors, including the assignee of a portion of the guaranteed obligation.*

The majority opinion seems to imply, however, that, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

---

[2] Hereafter I shall, for convenience, treat the uncertificated portion of the mortgage as identical with the repurchased certificates; as the majority points out, Prudence was the true owner of both.

[3] Were the facts of this case such as to bring it within the general outlines of the rule of the Taylor case, supra, we would be obliged to consider the significance of

the cautionary comments in Consolidated Rock Products Co. v. DuBois, March 3, 1941, 61 S.Ct. 675, 85 L.Ed. 982.

[4] In such a situation, the federal courts are bound by the decisions of the New York courts as to whether language in the contract has the effect of overcoming the New York rule as to subordination, for such decisions relate to the intention of the parties to the contract.

1188, 114 A.L.R. 1487, we are not free to apply the rules generally applicable in federal bankruptcy decisions because subordination is required by the New York decisions as to the *intention of the parties* to such contracts. But I do not read the New York decisions as holding that subordination, in such a case as this, results from the actual intention of the parties. As I understand those decisions, they say that subordination is an equitable rule of administration in the distribution of the primary obligor's assets among an insolvent guarantor and its assignee-creditors. The preference is granted even when, as in the case at bar, there is no evidence of any kind—in the verbiage of the contract or otherwise—that the parties had any actual intention to create or not to create one.[5] Absent any evidence of such an intent, the New York Court, nevertheless, sustains such a preference as against the other creditors of the insolvent guarantor on the basis of what that Court calls "the existence of special equities" arising solely from the guaranty. Matter of Title & Mortgage Guaranty Co., 275 N.Y. 347, 355, 9 N.E. 2d 957, 960, 115 A.L.R. 35; Title Guarantee & Trust Co. v. Mortgage Commission, 273 N.Y. 415, 426, 7 N.E.2d 841; In re Union Guarantee & Mortgage Company, 285 N.Y. 337, 34 N.E.2d 345. Reference is also made to "the implied or actual intent of the parties"; Pink v. Thomas, 282 N.Y. 10, 15, 24 N.E.2d 724, 726; Granger v. Crouch, 86 N.Y. 494; "implied" is significantly differentiated from "actual" intent and thus means intent "implied in law", i. e., not intent at all. And the same is true of the locution in some of the above cases as to a "presumption of intent" as distinguished from the "actual intent." In Pink v. Thomas, supra, 282 N.Y. page 12, 24 N.E.2d page 725, the court states the basis of the rule thus: "Having guaranteed the payment of the certificates it would be highly *inequitable* to permit it [the guarantor] to step in and divert part of the security available to pay such certificate holders whom it had expressly guaranteed should be paid"; the guarantor may hold on a parity, if the contract clearly shows that the parties intended it; but "such an *inequitable result* could be accomplished if the lan-guage used was so clear and unmistakable that the courts would be compelled to give effect to the intent of the parties as expressed in the writing. Otherwise the *equitable rule* should prevail." [6] That is not the verbiage which the New York court would employ if it were determining that the parties had an actual intention, expressed in their contract, to create a preference; but it is verbiage appropriate in spelling out a rule of insolvency administration. And my brother judges concede that Erie R. Co. v. Tompkins does not require us to adopt such a rule.

A contrary argument (implied in the majority opinion here) runs thus: If a contract relating to the sale of a guaranteed obligation contains an express provision showing a clear intention to negate the New York subordination rule, such a provision is given effect by the New York courts; consequently the failure to insert such an express negating provision in the contract is the equivalent of intentionally inserting an express provision adopting the New York rule of administration of the guarantor's insolvent estate; therefore, where, as here, no such negating clause was included, we are not substituting the New York rule of insolvency distribution for the federal bankruptcy rule, but are compelled to apply an actual provision of the contract which is implied in fact. That argument proves too much; it amounts to saying that parties to a contract are always to be deemed actually to intend to include in their contract any rule of law which they could, by contract, nullify, but which they do not. Such an argument, too, rests on a fiction; and fictions should be sparingly employed and never utilized to bring about unjust results. United States v. 1960 Bags of Coffee, 8 Cranch. 398, 415, 3 L. Ed. 602; Helvering v. Stockholms Bank, 293 U.S. 84, 92, 55 S.Ct. 50, 79 L.Ed. 211; Curry v. McCanless, 307 U.S. 357, 374, 59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162.

Even if the majority opinion were correct in suggesting that the New York courts have said that their rule is not one of insolvency administration, but one of interpretation of the intention of parties to this kind of contract, I would still dissent. For I cannot believe that what,

---

[5] In some of the cases decided by the New York court, it found language in the contract showing an actual intention to create a preference. But in the case at bar there is not a vestige of such language.

[6] Italics added.

by its nature, is a rule of administration of insolvent estates can be transformed into such a rule of interpretation—and that, therefore, it becomes binding on the federal courts—merely because of the label attached to the rule by the State Court. To illustrate: In applying the doctrine of Taylor v. Standard Gas & Electric Co., supra, the Supreme Court did not look to the decisions of the State Court. If the courts of that State were hostile to the rule of the Taylor case, and (taking a hint from the majority opinion in the instant case) were to say that it construes contracts made by creditors with a subsidiary corporation as showing an intention to exclude the rule of the Taylor case unless expressly contracted for, I doubt whether the Supreme Court would, simply on that account, refuse to apply that rule. In other words, I doubt whether Erie R. Co. v. Tompkins is so cannibalistic.

And my doubt is especially strong where the rule of the State Court is squarely contrary to the federal rule under the federal Bankruptcy statute and where federal jurisdiction is founded upon that statute. If the majority opinion is correct, Erie R. Co. v. Tompkins is likely soon to break up such uniformity of federal decisions as now exists relative to federal bankruptcy administration. What will then become of the provisions of the Constitution (art. 1, § 8, cl. 4) which authorizes Congress to enact *"uniform* Laws on the subject of Bankruptcies through the United States?" Surely respect for States' rights should not be carried that far. It has never been suggested that statutes enacted under the interstate commerce or admiralty clauses must be given varying applications responsive to divergent State decisions; yet those clauses of the Constitution, unlike that relating to bankruptcies, make no explicit mention of laws which are to be "uniform * * * throughout the United States." Erie R. Co. v. Tompkins, according to some of the Justices who joined in it, repudiated the rule of Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, because that rule, in so far as it

permitted the federal courts to ignore State court decisions, was unconstitutional; but no one would venture to deny to Congress the power to provide that, generally, uniformity and not variety should govern in bankruptcy; and such congressional intention should be presumed in the light of the express wording of the bankruptcy clause.

Related considerations are pertinent with respect to the suggestion in the majority opinion that, even if we are free to ignore the New York rule, we should not do so, since, thereby, persons in similar circumstances, vis-a-vis an insolvent guarantor, will be treated differently by State and federal tribunals. Such an argument is self-defeating: No doubt uniformity between State and federal courts is desirable; but so is nationwide uniformity of bankruptcy administration; if the majority opinion assists in establishing the first of these, it helps to destroy the second. Where a paramount public policy does not demand it, I can see no reason for our going out of our way to transplant, from the State to the federal courts, a doctrine which is so curiously lacking in logic and fairness as the New York rule of automatic subordination.

Although not considered in the majority opinion, there is this further possible argument to sustain the preference: It might conceivably be argued that the rule of the New York court had the effect of creating an equitable lien in the Zo-Gale mortgage, in favor of the public certificate holders, i.e., that, in effect, the guaranty, from its inception, gave them a first lien on that mortgage. But the New York court nowhere suggests that its rule is to be taken as creating such an equitable lien; in all likelihood such a basis for the rule has not been advanced, because the existence of such a lien could not be reconciled with the fact that, under the New York decisions, the guarantor, with entire legality, could destroy the lien at any time, by merely selling the unissued or repurchased certificates, without the consent of the holders of the then outstanding publicly held certificates.[7]

---

[7] Such a "lien" would not rise even to the dignity of an unrecorded chattel mortgage. It may also be noted, in passing, that the rights of the Trustees in bankruptcy of Prudence vested before Amalgamated went into bankruptcy.